# NAGLE v. ROBINS.

Guardian and Ward — Investments — Approvals—Making Investment without an Order — Effect of Subsequent Approval — Conversations with Judge — Purchase of Corporate Stock to Protect Other Capital Invested in Same Stock — Loans upon Security of Corporate Shares — Duty and Liability of Guardian — Constitutional Law — Failure to Collect by Legal Proceedings — Speculative Values as Basis of Security — When Interest Chargeable upon a Guardian — Evidence — Counsel Fees — Jurisdiction to Allow on Error.

1. The absence of an order of court directing a loan of the ward's money by the guardian, is not alone sufficient to entitle the ward to refuse to accept the investment and the securities representing it. Neither is it sufficient, of itself, to entitle the ward to refuse to accept certain shares of stock purchased by the guardian to protect the capital of the ward already invested in the stock of the same concern.

2. A subsequent intermediate approval does not protect the guardian to the same extent as an original order directing the loan or investment.

3. A guardian has power to make investments by loan, and to expend money for repairs, and for the protection of the estate in his hands, generally and ordinarily, without an order of court; but in doing so, he runs the risk of having his acts

disapproved by the court. If the guardian secures an order directing him to make a particular loan or investment, he will be protected, even should misfortune follow the investment; but where he acts without an order, the ward may, upon final settlement, question the character of the investment, and the prudence and frugality of the guardian in making it, and cause the latter to be surcharged with money loaned and lost by reason of inadequate or improper security.

4. Where the guardian acts without a previous order in making a loan or investment, a subsequent intermediate approval thereof will be *prima facie* evidence in favor of the guardian, but they are not conclusive upon the ward.

5. Conversations between the guardian and the judge of the court preceding the making of the investments, and verbal advice of the judge to make them, cannot operate as orders or directions authorized by the statute, so as to be conclusive upon the ward ; but they may go to show the good faith of the guardian and the knowledge of the judge at the time of entering the subsequent order of approval.

6. A purchase of corporate stock, to protect a large amount of the capital of the ward invested in the same company before coming into the guardian's hands, should be upheld upon the same principle as expenditures for repairs are sustained, if the same be reasonable and necessary, and beneficial to the estate. And, *held,* that a purchase by the guardian of certain shares in a mercantile company should be sustained, it appearing to have been reasonable and necessary, according to the events occurring at the time, to save the other shares of the ward in the same company from depreciation if not destruction in value; the guardian's counsel and the judge having at the time advised the purchase.

7. A purchase of corporate stock, reasonably made for such purpose, is not within the constitutional inhibition against the investment of trust funds in the bonds and stocks of private corporations. (Art. 3, Sec. 38.) (Corn, J., dissenting.)

8. A loan to an individual for which a promissory note is executed, requiring the payment absolutely of the money loaned, with interest, secured by shares of stock of a corporation, does not constitute ·an investment in the stock of a private corporation — at least, within the sense of the constitutional provision prohibiting the investment of trust funds in the stock of private corporations, or of any rule of law forbidding an investment by a trustee in such stocks. (Corn, J., dissenting.)

9.   A guardian, in the investment of funds in his hands, must conduct himself faithfully, and exercise a sound discretion; he is bound to act honestly and prudently, and to exercise the care and judgment of ordinarily prudent and intelligent men in their own affairs.   He is not an insurer of the property, and will not be chargeable for a mere error of judgment, nor for incidental injuries and losses not occasioned through his negligence or lack of prudence.

10.   The acceptance of shares of stock in corporations as security for a loan made by a guardian is not to be conclusively regarded as a lack of that prudence and care which a guardian or trustee is bound to exercise; and assuming that the guardian has in fact acted prudently and in good faith, the acceptance of such securities is not, as a matter of law, illegal, so that the ward can refuse to accept the investment solely on that account.

11.   In loaning money of the estate, the guardian should be held to the exercise of such caution and wise discretion as a prudent conservative man would bring to the conduct of his own affairs with regard to the ultimate preservation of his capital employed in loaning out upon interest; and, before accepting stocks as collateral, he should inform himself respecting the character of the concern for soundness, management, and genuineness.   The company should not be a fictitious or experimental one.

12.   Where the guardian took as collateral for a loan certain shares of stock in two large-going concerns, both of them solvent, and engaged in a paying business, the facts are discussed, and it is held that the guardian had been prudent and should not be surcharged with the loan.   There had not resulted any loss, in fact, except that the loan was overdue, and had not been collected, and the probabilities, in the opinion of the court, were slight that there would be any loss.

13.   A loan should not be charged back upon the guardian merely because it is overdue and uncollected, and interest has accrued on it, and the guardian has not pursued coercive measures to collect it, where it does not appear that there has been or will be a loss, and even if there should be, that it will be the result of the guardian's neglect to use the processes of the law to enforce payment.   The excuse in the case at bar for not enforcing payment by selling the securities, or by legal measures, being that it was deemed best to forbear doing so in the belief that such action would more surely result in final payment of the money, and the securities were not

becoming less valuable, and they were sufficient to cover the amount uncollected: and it was held that the guardian should not be charged with the loan for failure to collect by legal measures, as it did not appear that any loss which might occur will be the result of the neglect of the guardian.

14. Real estate whose only value commensurate with the amount of the loan is speculative, depending upon the growth of a city near which it is situated, so that it might, if such growth should occur, be in demand for city homes, but whose value as country property is too small to furnish adequate security for the loan, should not be accepted by a guardian as security upon the basis of its speculative value. Such values are too unreliable, unsubstantial, and uncertain for consideration in the investment of trust funds.

15. Upon the facts in this case, *held*, that the investigation of the guardian as to the value of certain property having only a speculative value at all commensurate with the loan, was not sufficient and thorough to absolve him from responsibility, and, *held*, that he should be charged with the loan.

16. Where a guardian is to be charged with an imprudent investment, he should be charged with all interest actually received, as whatever gain or profit may flow from the employment of the ward's money cannot be allowed to enure to the benefit of the guardian; but he is otherwise only accountable for such interest or profit as he might have obtained by the exercise of reasonable skill and exertion in the management of the fund.

17. In the case of imprudent investments, interest is not charged to a trustee as a punishment, but only to attain the actual or presumed gains and to make certain that nothing of profit or advantage shall remain to the trustee, beyond his commissions or compensation.

18. Where the guardian testified that he always had money on hand, and found it difficult to obtain good loans, although he refused none he believed to be good, and that during the large part of the time a panic swept the country, interfering with securing safe loans; and the ward made no attempt to show that the guardian could have safely invested the money otherwise than by the loan objected to, by the exercise of reasonable skill and diligence, and the guardian's testimony was uncontradicted; *Held*, that there was nothing upon which to charge the guardian with any interest upon the investment except that which he had actually received.

19. Although the value of all real estate is more or less speculative or prospective when it is vacant or but slightly improved, yet where property is so situated that it is suitable as a location for business or resident purposes within a city, it has an actual value for these purposes.

20. Evidence of consultations between the guardian and the judge of the court prior to making the several investments in question, and the verbal advice of the judge respecting them is admissible upon the question of the good faith of the guardian. Upon the same ground, and to show the prudence of the guardian, evidence is admissible of the making of previous loans by the ward's father, a conservative business man, upon the security of stocks in the same concerns as those accepted by the guardian and objected to, the estate of the ward having come from his father, since deceased.

21. A guardian is entitled to be indemnified for expenses of accounting, and for reasonable expenses, including counsel fees, incurred in successfully resisting exceptions to his account and investments.

22. The supreme court has no authority to make an allowance to a guardian for counsel fees in defense of his accounts in proceedings in error in said court, since that would be the exercise of original as distinguished from appellate jurisdiction.

[Decided September 7, 1900. Application for counsel fees in the Supreme Court denied November 15, 1900.]

EXCEPTIONS to final report of William A. Robins as guardian of the estate of George H. Nagle, a minor. The district court decided adversely to the ward, and sustained the acts of the guardian. The ward prosecuted error. The facts are stated in the opinion.

*Wells & Taylor*, and *Clark & Breckons*, for plaintiff in error.

The constitution prohibits the Legislature from authorizing, by any kind of legislation, the investment of trust funds in the bonds or stock of private corporations. (Art. 3, Sec. 38, Sec. 27). Hence the court cannot derive any power to ratify such investments. It cannot exercise any power not specially conferred by statute, or necessary to carry out the powers so conferred. In

probate matters, the district courts must act strictly within
the statute, and possess no additional authority by
virtue of their common law and equity powers. (1
Woerner, Adm., 142; Woerner on Guard'p, Sec. 66;
Smith v. Westerfield, 88 Cal., 374; Buckley v. Super.
Ct., 102 id., 6; Olmstead's Est., 120 id., 447; 29 Pac.,
230; Stuttmeister's Est., 75 Cal., 346; Mayo v. Tudor's
Heirs, 12 S. W., 118; Ry. Co. v. Jordan, 16 L. R. A.,
255; Heirs etc. v. Johnston, 3 O., 553; 70 Fed., 341;
69 Me., 285; In re. Bottom, 46 N. Y. Supp., 908. 12
Ency. L., 276; Bank v. Dudley, 2 Pet., 492.) The Leg-
islature is alone competent to act as the general guardian
of those incapacitated from acting for themselves. The
power to make provision for the estates of ˜minors resides
in the Legislature as *parens patriae*. (Hoyt v. Sprague,
103 U. S., 613; R. R. Co. v. Blythe, 69 Miss., 939;
Rice v. Parkman, 16 Mass., 326; Cooley's Const. Lim.,
120-22; 11 Ency. L., 818; Randolph v. Land Co., 104
Ala., 355). The prohibition of the constitution follows
as a rule which has been demonstrated by experience to
be the true rule, and has received the almost universal
sanction of the courts. (2 Pom. Eq. Jur., Sec. 1074;
2 Beach Trustees, 528; Flint Trust., 167; Tiedman Eq.
Jur., 320; Whittaker's Smith Neg., 263; Woerner
Guard., Sec. 63; 2 Woerner Adm., 336; 1 Perry Trusts,
453-56; 2 Story Eq. Jur.,1273-74; Simmons v. Oliver,
43 N. W, 561; Tucker v. State, 73 Ind., 242; Tucker v.
Tucker, 33 N. J. Eq., 236; Smith v. Smith, 5 Johns,
Ch., 284; King v. Talbot, 40 N. Y., 88; Wynne v.
Warren, 2 Heisk, 126; Worrell's App., 9 Pa. St., 512;
Nyce's Est., 5 W. & S., 254; White v. Sherman, 48 N.
E., 128; App. of Baer, 18 Atl., 1; Clark v. Garfield,
8 Allen, 427; 84 Me., 545; 9 L. R. A., 279.) The
evidence does not support the finding that the purchase
of the U. Merc. stock was solely for the protection of
the capital of the ward already invested in the same com-
pany. There was no necessity for the purchase and if
the guardian so represented to the court, he perpetrated

a fraud on the court and that is sufficient reason for charging him with the investment. (Slaughter v. Favorite, 107 Ind., 291; 48 N. E., 128).

The burden of proof rested on the guardian, and he must establish to the satisfaction of the court that he acted with prudence in making the investments excepted to. (Thornton & Blackledge on Adm. 775–6, 758, 763, & cases cited ; Brownlee v. Hare, 64 Ind., 311; Hamlin v. Nesbit, 37 *id.*, 284 ; Taylor v. Burt, 91 *id.*, 252 ; State v. Wheeler, 127 *id.*, 451 ; Wysong v. Nealis, 41 N. E., 388.) Due care was not used in making the Altman loan. There was gross negligence in that matter. The guardian was not authorized to take a mortgage on lands situated outside the state. (1 Perry Tr.,452 ; 2 Pom. Eq. 1074 ; Ormiston v. Olcott, 84 N.Y. 339 ; 2 Woerner, Adm.336; Woerner Guard.,208 ; Denton v. Sanford,103 N. Y., 607; McCollough v., McCollough, 44 N. J. Eq., 313; Thort & Black. Adm., 181; 40 Am. Dec., 513.) The value of the property was altogether speculative, thus making it improper as security for the investment of trust funds. (Garesche v. Priest, 9 Mo. App., 270; Adair v. Brimmer, 74 N. Y.,539; 2 Woer. Adm., 704–711; Woer. G., 207–220; 2 Pom. Eq., 1071–74.) In determining whether the security is adequate, the test is what the property would bring at forced sale. ( 2 Woer. Adm., 709; Perrine v. Petty, 34 N. J. Eq. 193; Gilbert v. Kolb, 37 Atl., 423.) The guardian must not only exercise proper care in loaning money, but he must be diligent in collecting it at maturity. ( Woer. Guard'p. 181; *id.*, 345; 1 Thort. & Blackl., 241; 2 *id.*, 367; 1 Perry Tr., 440; Schouler Domestic Rel., 374; 7 Ency. L., 347, 350, & n.; Schultz v. Pulver, 3 Paige, 182; 11 Wend., 361; Cooley v. Van-Sycle, 14 N. J. Eq., 496; State v. Gregory, 68 Ind., 110; *In re* Sanderson, 74 Cal., 200; *In re* Moore, 31 Pac. 384; Ellis v. Nagle, 9 Cal., 684; Line v. Lawder, 122; Ind., 548; Siegler v. Siegler, 7 S. C., 317; Turberville v. Flowers, 3 S. E., 542; Stirling v. Wilkerson, *id.*, 533; Williams v. Petticrew, 62 Mo., 460; State v. Womack,

72 N. C., 347; Strothoof v. Reed, 32 N. J. Eq., 213; Kimball v. Perkins, 130 Mass., 141; Bond v. Lockwood, 33 Ill., 220.) A guardian is not permitted to invest the trust money in personal securities. In the Warren loan the collateral was stock in private corporations, and not only was the investment prohibited by the constitution, but it was an investment the trustee had otherwise no right to make. It was an investment, notwithstanding the transaction was a loan upon the note of the borrower secured by the collateral stocks. An investment occurs whenever the amount is represented by anything but money. (11 Ency. L. 823; People v. Com'rs., 23 N. Y., 242; Simmons v. Oliver, 43 N. W., 562 (Wis.); Tucker v. State, 72 Ind. 242; Tucker v. Tucker, 33 N. J. Eq. 236; 4 Johns. Ch. 284; 40 N. Y. 88; 2 Heisk., 126; 18 Atl., 1; 9 Pa. St. Worrell's App., 5 W. & S., 254.)

In making loans it is the duty of the guardian to take adequate security, though he loan to a man entirely responsible at the time. (Bogart v. VanVelsor, 4 Edw., Ch. 718.) The security was inadequate in the case of all the investments objected to. The guardian is bound in his reports to make full disclosure, yet the guardian in this case did not do so. The notes were not described as to date and time of maturity, nor was the nature of the security mentioned. It will not do to say that he talked with the judge. The matter should appear by the record. Had there been no exception to the final report the court should have sent it back to the guardian for a detailed report. (Hirshfield v. Cross, 67 Cal., 661· In re Moore, 54 Pac., 148.)

The orders approving the loans are not binding upon the ward. The directions of the statute were not complied with. In no instance was a day set for hearing the reports; and a day was not appointed for settlement, as required by law. (Laws 1890–91, p. 243, Sec. 3; id., Sec. 1, p. 301; Sec. 13, pp. 312–, 313; Sec. 4, p. 288; Sec. 11, p. 289; Sec. 17, p. 290; Sec. 18, p. 290; Sec.

19, p. 290; Sec. 20, p. 290–1.) The sections referred to unquestionably refer to periodical accounts or reports. Not having been made as required by statute, the orders are not binding upon the ward. (Woer. Guard'p. 324; Burnham v. Dalling, 16 N. J., Eq. 144; Guardianship of Cardwell, 55 Cal., 137; Schouler Domestic Rel., 372; State v. Roeper, 9 Mo. App., 21; Sheetz v. Kirtley, 62 Mo., 417; Bourne v. Maybin, 3 Woods, 724.) The ward cannot be bound by an approval of a partial account without notice. 2 Woer. Adm., 1124–25, 1186; 1 Thort. & Blackl. Adm. 460–1; Tiffany's Domestic Rel., 341; Horner's Pro. L., 396; 9 Ency. Pl. & Pr., 966; Frieberg v. DeLamar, 7 Tex. Civ. App. 267; *In re* Davis, 62 Mo., 456; Kidd v. Guibar, 63 *id.*, 342; Radford v. Morris, 66 Ala., 283; State v. Jones, 1 S. W., 355; Henley v. Robb, 86 Tenn., 474; State v. Wheeler, 127 Ind., 451; Massick v. Beebee, 17 Kan., 47; Sherry v. Sansberry, 3 Ind., 320; Blake v. Pegram, 101 Mass., 592; Bennett v. Hanifen, 87 Ill., 31; Coburn v. Loomis, 49 Me., 406; Durworth v. Kirby, 37 N. E., 729; Coffin v. Bramlet, 42 Miss., 194.)

If the law were otherwise, the reports in the case at bar were so meager, and misleading in their nature, that the order of approval would not protect the guardian, nor would the ward be bound thereby. (Woerner Guard'p, 321; 2 Thort. & Blackl., 756; State v. Gooch, 2 Am. St. R., 284; Slaughter v. Favorite, 107 Ind., 298; Hirshfield v. Cross, 67 Cal., 662; Smoot v. Richards, 27 S. W., 967; *In re* Sanderson, 74 Cal., 203; 2 Pom. Eq., 902; Moore v. Asken, 85 N. C., 199; Cox v. Mauvel, 57 N. W., 1062; *In re* Craudstrand, 40 Minn., 438; Skelton v. Ordinary, 32 Ga., 266; White v. Sherman, 48 N. E., 128; Woerner Guard'p, 215–19,)

A guardian does not have lawful power to lend the ward's money without obtaining from the district court an order or direction to do so. The statute authorizes the court to direct the guardian to invest the moneys of

the ward in suitable securities, but only after notice to persons interested in the estate. The statute is plain, and properly construed, denies to the guardian any power to invest without a previous order of court. If he does so, the ward may refuse to accept the investments. (Woerner Guard'p, 203; *id*, 218; Sullivan v. Howard, 20 Md. 191; Hendricks v. Richards (Neb.), 78 N. W., 378; Cardwell's case, 55 Cal., 137; McIntyre v. People, 103 Ill., 142; Hughes v. People, 111 Ill., 460; Carlisle v. Carlisle, 10 Md.,440; Williams v. Campbell, 46 Miss., 57; Garesche v. Priest, 78 Mo., 126; Coffin v. Bramlett, 42 Miss., 194; Bryant v. Craig, 12 Ala., 354; Bates v. Dunham, 12 N. W., 310; Slusher v. Hammond, 63 N. W., 185; Gray 'v. Fox, 1 N. J. Eq., 259; Shepherd v. Newkirk, 21 *id.*, 302; Winslow v. People, 117 Ill., 152; Brown v. Wright, 39 Ga., 96; Rogers v. Tullos, 51 Miss., 685; Zimmerman v. Frailey, 17 Atl., 561; Hayes v. Ins. Co., I. L. R. A., 303; 42 Cal., 290; 1 Perry Tr., 452, 459; Schouler Dom. Rel., 348, 353.)

The court had no authority to ratify or confirm investments made without a previous order. When the guardian makes an unauthorized investment, the ward, on arriving at his majority, may either affirm or disaffirm it at his pleasure. If it is to his advantage, he may take it if he chooses, but he is under no compulsion to do so. (2 Pom. Eq., 1074; Woerner Guard'p. 60; Richardson v. Boynton, 90 Am. Dec. 141; King v. Talbot, 40 N. Y., 76; Baker v. Disbrow, 18 Hun., 30; 2 Beach Tr., 1582–3.) How then can the court take from the ward this legal right without notice? (Townsend v. Tallant, 33 Cal., 45; Shriver's Lessees, 2 How., 43; 55 Cal., 137; 111 Ill., 457; 42 Miss., 194; 28 Ind., 71.)

An order of the court must be in writing, and the verbal conversations with the judge were not admissible in evidence. (Carlisle v. Carlisle, 10 Md., 440; 3 O., 553; 14 Md., 388; 12 Mo., 598; 30 Ga., 780; 53 Ga., 138; 3 Ind., 320.) So was the testimony as to the loans made by the father of the ward inadmissible. The court

was without power to award counsel fees to the guardian incurred in resisting the exceptions. The authority, if any, must be found in the statute, and none is to be found there. (Hunt v. Maldonado, 27 Pac., 56; Stuttmeister's Est., 17 *id.*, 223; Moses v. Moses, 50 Ga., 10; Burr v. Mc Ewen, 4 F. C. No. 2193; Heister's App., 7 Pa. St., 457; Buckham v. Smith, 55 *id.*, 335; Heath's Est., 58 Ia., 36; Att'y Gen. v. Ins. Co., 91 N. Y., 57.) All the cases hold that with respect to loans as to which the guardian has been negligent he is not entitled to counsel fees. (Blake v. Pegram, 109 Mass., 541; Bendall v. Bendall, 24 Ala., 295; Anderson v. Anderson, 37 *id.*, 683; Robins v. Wolcott, 27 Conn., 232; Est. Goetschins, 3 N. Y., Misc., 155; Barschite's App., 126 Pa. St., 404; Lilly v. Griffin, 71 Ga., 541; Steyer v. Morris, 39 Ill., App., 382; *In re* Moore, 72 Cal., 335.)

*John W. Lacey* and *Burke & Fowler*, for defendant in error.

The contention of counsel for plaintiff in error that courts of probate have no powers whatever except such as first exist in the Legislature, and are by the latter delegated to the probate courts, is incorrect. The Legislature would have no power to enter the judgment in this case. Although in a limited sense the court derives its power to enter judgment from the Legislature, yet the Legislature did not *delegate* to the court the power to enter it. At common law, and by the Roman law, a guardian had power, and it was his duty, to invest the personal estate of the ward; and he did not need a previous license from the court to do so. As to personal property, the rule is that the guardian's control does not depend upon statute. (Woer. Guard'p, 179; *id.*, Sec. 62, 63; Owen v. Peebles 42 Ala., 338; *In re* Thorp, 23 F. C., p. 1153; Maclay v. Assur. Soc., 152 U. S., 499.) His duties arise from the inherent nature of the trust. The terms of every statutory and constitutional provision as to investments by guardians must be construed in the light of this ancient well-known rule as to the inherent power of the guardian

and his duty to invest, and as to the inherent power of the court to whom the guardian is answerable, to direct and control the investment. The general orders made by the English chancellors as to the investment of trust funds in public securities were made to create a demand for such securities, and not for the purpose of better securing trust funds. (Brown v. Wright, 39 Ga., 96; Barton Est., 1 Pars. Eq., 28; Woer. Guard'p., 211; Note to Nyce's Est., 40 Am. Dec., 498.) Parliament was compelled to enlarge the rules laid down by the courts (2 Beach Tr. 1206 p.; 11 Ency. L., 824.), and investments in stocks of corporations were authorized. The constitutional provision invoked here is found among restrictions upon legislative powers. There is no attempt to restrict the power either of the guardian or the court as such power clearly existed.

The courts have always been conservative, while legislatures have not been; hence the latter was restrained, but the courts were left with their inherent power unrestrained. In some States investments in stocks are not permitted by the courts. New York, New Jersey, and Pennsylvania have been more strict than the New England States. In many States the only rule is to require of the trustee good faith and sound discretion, such as men of prudence exercise in the permanent disposition of their own funds. (Harvard Coll. v. Amory, 9 Pick., 446; Lovell v. Minot, 20, id., 116; Kinmoth v. Brigham, 5 Allen, 270; Brown v. French, 125 Mass., 410; Clark v. Garfield, 8 Allen, 427; Knowlton v. Bradley, 17 N. H., 458; Kimball v. Reding, 11 Fost., 352; French v. Currier, 47 N. H., 88; Barney v. Parsons, 54 Vt., 623; Hammond v. Hammond, 2 Bland, 306; Gray v. Lynch, 8 Gill, 403; Murray v. Feinour, 2 Md. Ch., 418; Smyth v. Burns, 25 Miss., 422; Boggs v. Edgar, 4 Rich., Eq., 408; Spear v. Spear, 9 id., 184; Snelling v. McCreary, 14 id., 291; Moses v. Moses, 50 Ga., 9; Bryant v. Craig, 12 Ala., 354; Foscue v. Lyon, 55 id., 440; Lamar v. Micou, 112 U. S., 452.) Even if the purchase of the U. M. Co. stock, and the loan to Warren upon

collateral stock were investments, no rule of law or pro-
vision of the constitution was violated since the court had
power unrestricted to permit such investments, and the
guardian had the right to make them.   But there is
a difference between an investment, as such; and putting
money to use as protection of funds already invested.
(Collinson v. Lester, 20 Beav., 356; Drake v. Crane
(Mo.), 29 S. W., 990.)   The mercantile stock was pur-
chased to protect other capital already invested; and upon
this issue of fact the finding was for defendant.

The ratification by the approval orders was equivalent
to a previous order directing the investments.   The guard-
ian represented the ward, and the latter is not one of the
interested parties who are to be notified.   The guardian
speaks for him.   Notice to the ward was not required, for
a direction of the court, and it was not required for the
court to make an order approving the investment.   (Mohr
v. Maniere, 101 U. S., 417; Daughtry v. Thweatt, 16 So.,
920; Mohr v. Porter, 51 Wis., 487; Thompson v.
Thompson (Ala.), 9 So., 465; Newman v. Reed, 50 Ala.,
297; Brewer v. Ernest (Ala.), 2 So., 84; Stuart v.
McMurray, 3 *id.*, 47; 39 Ga., 96; Hughes v. People,
10,111., App., 148; *In re* Cardwell, 55 Cal., 137; Est. of
Cousins, 111 Cal., 441; Curtis v. Devoe, 53 Pac., 936,
121 Cal.; Wallace v. Holmes, 29 F. C., 74; May v.
Skinner, 149 Mass., 375; Clark v. Garfield, 90 *id.*, 427;
Durett v. Com. (Ky.), 14 S. W., 189; 152 U. S., 499;
Moore's Est., 31 Pac., 584; *In re* Niles, 113 N. Y.,
547; Schneider v. McFarland, 2 Comst., 45; Hawkins v.
Hawkins, 28 Ind., 71; Schouler Dom. R., Sec. 385;
O'Hara v. Shephard, 3 Md. Ch., 306; Hurt v. Long, 16
S. W., 968; Frankenfield's App., 102 Pa. St., 589; Lan-
caster v. Lancaster, 13 Lea., 126; Cheney v. Roodhouse
(Ill.), 25 N. E., 1019; Clark v. Anderson, 13 Bush, 111;
Kirkman *ex parte*, 3 Head, 517; Warren v. Bank, 51
N. Y. Supp., 27; Rusk's Ex'r. v. Steele (Va.), 25 S.
E., 604; Hyland v. Baxter, 98 N. Y., 610; *In re* Clary,
112 Cal., 292.)

The law does not cast upon a trustee extraordinary

duty, nor demand extraordinary care, nor hold him liable for mere error of judgment. Much less does it make him an insurer of the property. If he exercised the care and judgment of ordinarily prudent men in their own affairs, he will not be chargeable for his mere errors of judgment, nor for incidental injuries and losses. (2 Pom. Eq., Sec. 1070; 9 Pick., 446; Belchier v. Parsons, Ambler's R., 219; State v. Guilford, 18 O., 500; Miller v. Proctor, 20 O. St., 442; Knight v. The Earl, etc., 3 Atk., 480; Thompson v. Brown, 4 Johns. Ch., 619; Woer Guard'p., p. 197; State v. Slevin, 93 Mo., 253; Hardin v. Taylor, 78·Ky., 593; Ellig v. Naglee, 9 Cal., 684; Barney v. Parsons, 54 Vt., 623; State v. Gramm, 7 Wyo., 329; Pleasant's App., 77 Pa. St., 369; Jack's App., 94 id., 372; 111 Cal., 450; Fahenstock's App., 104 Pa. St., 52; Pleasanton's App., 99 id., 369; Lancaster Tr. Co's App., 176 id., 162; Bradley's App., 89 id., 514; McIntire v. People, 103 Ill., 147; Watson v. Stone, 40 Ala., 462; Olds' Est., 176 Pa. St., 162; App. of Small, 22 Atl., 809; Brown v. French, 125 Mass., 410.) The power of the court to authorize is not mandatory, but permissive, and whether before or after the investment, the approval of the court will bind the ward, as an election on his behalf.

The findings of the trial court in this matter as to a question of fact will be viewed as favorable as the verdict of a jury. The decisions of this court in many cases have maintained that a finding will not be disturbed unless it appears to have been entirely against the evidence or have no evidence to sustain it. The evidence as to the Altman loan is sufficient to sustain it under any rule adopted by this court. There is no hard and fast rule prohibiting investments out of the State. This case comes clearly within the exceptions of the New York rule. Special circumstances existed — loans could not be obtained in this jurisdiction. The money was at hazard in the banks, and a reasonable investment could be obtained

outside. Again, it is not the general rule that a loan cannot be made outside the jurisdiction of the courts controlling the estate. (112 U. S., 452; 8 Allen, 427; 125 Mass., 410; 130 *id.*, 262; 17 N. H., 458; 54 Vt., 623; Moore v. Eure (N. C.), 7 S. E., 471; 93 Mo., 253.)

The taking of shares of stock as collateral was not an investment in the stock. The profit to be received was not a contingent one depending upon dividends, but an annual return by way of interest was contracted for. The stock was not purchased at all, but was taken in pledge to secure the return of the money. (20 Pick., 116, 9 *id.*, 140.) No case has been cited where a guardian has been surcharged for a loan prudently made upon stocks as collateral; and as has been shown by the cases cited above, many courts — those of New England, and the Southern and Western States generally permit direct investment in such stocks. The only hard and fast rule is that the guardian must act in good faith and with reasonable prudence. All other rules are only subsidiary, and are not inflexible. The Warren loan was made carefully and prudently. The security was sufficient, and the trustees made all reasonable endeavors to ascertain the truth about the stocks, and kept himself advised concerning them. Where there is no negligence in the original loan the guardian is liable for subsequent negligence only in case loss has been sustained. In this case there is no showing of loss. The security is as good as when taken. For failure to collect the guardian is not liable unless he has been guilty of fraud or gross negligence. The reasons given in this case are sufficient to absolve the guardian of any charge of either. He advised with the judge and counsel, and owing to the condition of the times and the community, it was deemed by all as the safer course to forbear, and not force the securities upon the market. (See Torrance v. Davidson, 92 N. C., 440; Moore v. Moore, 72 Cal., 335; Henderson v. Successors, 24 La. Ann., 435; Sterling v. Wilkinson (Va.), 3 S. E.,

533; Est. of Moore, 96 Cal., 522; 8 Ency. L. ( 2d. ed.), 544–5, 548, 556; Hair v. Barnes, 26 Ill. App., 580; Burness v. Hines, 94 Va., 413.) If coercive measures vigorously pushed are likely to result in loss, the fiduciary should not pursue them.

There is no hard and fast rule that a real estate mortgage shall be taken upon a valuation of what the property will bring at forced sale. Such a rule would exclude real estate mortgages as a line of investment in this State. There is ordinarily no market to guide one by under such a rule here.

Evidence of advice by the judge, and the guardian's conversations with him as to the various investments was admissible to show the good faith of the guardian. (Bradley's App., 89 Pa. St., 514; Pleasant's App., 77 *id.*, 369; 99 *id.*, 369; Cridland's Est., 132 *id.*, 479; Old's Est., 176 *id.*, 172; 3 Atk., Knight v. The Earl; 20. O. St., 422; 2 Woer. Adm., p. 708; Durett v. Com., 14 S. W. 189; Perrine v. Vreeland, 33 N. J., Eq., 102.) The court is really the supervisor, under the statute, of the estate, and the guardian is the aid, or servant of the court. " Directions" may be made by the court, and they need not be by formal orders. It cannot be true that every act incident to the administration must be the subject of formal litigation to permit the trustee to escape liability. If there was any error of the guardian, then it was the error of the superintend· ent — the court, for it was at all times advised and directed, although verbally, until the formal orders of approval were entered. The introduction of immaterial evidence is harmless, and no cause for reversal. ( 1 Greenl. Ev., Sec. 49; Elliott App. Pro., Secs. 593, 641; Borton v. Kane, 17 Wis., 38; Laterett v. Cook, 63 Am. Dec., 428; Brooks v. Dutcher ( Neb. ), 36 N. W., 128; Hansen v. Elton ( Minn. ), 38 *id.*, 614; Robinson v. Shanks, 118 Ind., 125.

Counsel fees incurred by the guardian in resisting the ward's exceptions to his report and accounts were prop-

erly allowed. (*In re* Carman, 4 N. Y. Supp., 690; 24 Ala., 250 *id.*, 295; Kingsbury v. Powers (Ill.), 22 N. E., 479; Woer. Guard'p., p. 351.)

A guardian is not liable for interest where proper investments could not be found, where he has failed to invest the money or has made improper investments. (Brand v. Abbott, 42 Ala., 499; Ashley v. Martin, 50 *id.*, 537; App. of Woomer, 22 Atl., 749; Est. of Cousins, 111 Cal., 441; Est. of Holbert, 48 *id.*, 630; Thompson v. Thompson, 9 So., 465; Woer. Guard'p., p. 220.) Had there been no testimony on the subject, the court would take judicial notice of the financial situation of the country, making it impracticable to secure safe loans. (50 Ala., 537; 55 *id.*, 440.) But the evidence is clear that safe investments could not be made.

The acceptance by the ward of interest which the guardian had collected upon the loans excepted to, amounted to a ratification of the acts of the guardian in making them. The rules of agency govern. (Walker v. Mulvean, 76 Ill., 18; Brazee v. Schofield, 2 Wash. Ty., 209; Handy v. Noonan, 51 Miss., 166; O'Connor v. Carver, 12 Heisk., 436; Hoyt v. Sprague, 103 U. S., 613.) The ratification of part ratifies the whole. (Babcock v. Deford, 14 Kan., 408; Raders, Adm., v. Maddox, 150 U. S., 128; Ins. Co. v. Patton, 119 Ind., 416; Craus v. Hunter, 28 N. Y., 389.) The ratification cannot be recalled. (92 N. Y., 596.) It is as binding as original authority. (Eaton v. Littlefield, 147 Mass., 122; Pollock v. Cohen, 32 O. St., 514; Hawkins v. Barker, 46 N. Y., 666; Taylor v. Robinson, 14 Cal., 396; 16 Minn., 388.) The conditions are accepted and ratified by the acceptance of benefits or profits. (Bacon v. Johnson, 56 Mich., 182; Hutching v. Ladd, 16 *id.*, 493; Hauss v. Niblack, 80 Ind., 407; Waterson v. Rogers, 21 Kan., 529; Durham v. Coal Co., 22 *id.*, 232; Connett v. Chicago, 114 Ill., 233; Keim v. Lindley (N. J.), 30 Atl., 1063; Bliven v. Lydecker, 130 N. Y., 102; Taylor v. Agr. Asso., 68 Ala, 229.)

The ward had two options, first to ratify any invest-
ment and receive the profits arising therefrom; and
second to reject it, and then if the investment should be
found to have been improper and that the guardian should
be held chargeable with it, the ward would be entitled
only to the sum originally invested, since it is not shown
that the money could have been otherwise profitably
invested.    He may not accept and retain the interest
upon an investment which the guardian has collected and
at the same time reject the investment.

POTTER, CHIEF JUSTICE.

On the first day of September, 1897, the ward then
reaching his majority, William A. Robins, guardian of
the person and estate of George Henry Nagle, a minor,
presented his final report.    The guardianship thus ter-
minating had continued from the date of the original
appointment, December 9, 1891.    Both parties were at
all times residents of Laramie County, in this State, and
the appointment was made by the district court of that
county.    A large amount of property came into the
guardian's hands, as the distributive share of the ward in
the estate of his father, the late Erasmus Nagle, deceased.
Upon the original inventory the estate was valued in the
aggregate as follows : Personal property, $157,704.00 ;
real estate, $26,296.00 ; total, $184,000.00.    Periodical
reports, usually twice yearly, were rendered by the
guardian, nine such reports having been filed in addition
to the final report.    Upon the face of the final report the
estate to be turned over to the ward consisted of per-
sonal property valued at $186,288.24, and real property
valued at $26,296.00, making a total of $212,584.24 ; thus
showing a net increase of $28,584.24, at the face valua-
tion of the investments and including unpaid accrued
interest thereon.    Inclusive of such unpaid accrued inter-
est, the gross amount of profits arising from rents and
interest upon loans is shown upon the face of the report
to have been $65,137.40.    This showing is based upon a

valuation at par of each of the investments and loans.

From the income of the estate the ward had been liberally maintained, supported, and educated, and various ·expenses incident to the administration had been paid, inclusive of a stated compensation to the guardian.

Upon the coming in of the final report, the ward filed exceptions to eleven investments. Either before or during the hearing the exceptions as to five loans were withdrawn, three of them having been paid, and two others accepted by the ward. The court found generally for the guardian as to each of the six investments remaining excepted to, and directed that the securities and evidences in relation thereto be delivered to the ward, and that the guardian be credited with the amount invested therein.

A motion for a new trial was overruled, a bill of exceptions allowed and signed, and the ward brings the case here, assigning as error the overruling of the motion for a new trial, which presents for review the decision of the district court as to each investment.

One ground of exception to each investment is that it was made by the guardian without a previous order of court. It is contended that this, of itself, renders the investment of the ward's property unlawful, and entitles him to reject it, and demand the amount in money with interest.

Although the investments were not made in pursuance of an order of court obtained beforehand, they were in each instance subsequently approved, by the order approving the particular report current which exhibited the investment. The approval orders in general ratified and confirmed the transactions of the guardian, and confirmed and approved all and singular the investments made by him, and also his action in continuing all and singular the investments as shown in the report. It is objected that the reports, except in one case, did not specifically show the nature of the investments, but merely reported a note of certain individuals for stated amounts. In the view we take of this matter we do not attach much importance

to this objection. Each order recites that the manner in which the money is invested is shown, and from the testimony, we are satisfied that the court was at all times fully informed of the character of the investments.

The contention of the plaintiff in error as to the effect of the absence of a previous order, is met by the claim on the part of the defendant in error that the subsequent approval is fully as effectual as an order in the first instance would have been, and renders the investment as conclusive upon the ward.

Investments by a guardian are governed by the following statutory provisions: ''Every guardian must manage the estate of his ward frugally and without waste.'' Rev. Stat., Sec. 4900. '' The court or judge, on the application of a guardian or any person interested in the estate of any ward, after such notice to persons interested therein, as the court or judge shall direct, may authorize and require the guardian to invest the proceeds of sales, and any of the other of the ward's moneys in his hands, in real estate or in any other manner most to the interest of all concerned therein; and the court or judge may make such other orders and give such directions as are needful for the management, investment and disposition of the estate and effects as circumstances require.'' R. S., Sec. 4922.

These provisions differ both in language and effect from those found in several States under which it has been held that the guardian is not authorized to invest the moneys in his hands at all without a previous order of court. Doubtless there are some things that a guardian would be unauthorized to do, even under our statute in the absence of a court order. It is probable that the investment of the trust funds by purchase of real estate is one of them. With one exception, the investments questioned in this case are loans, and the one which is not a loan is the purchase of certain corporate stock alleged by the guardian to have been taken to protect the capital of the ward already invested in the stock of the same concern.

We do not think that, upon a reasonable construction of our statutory provisions, the absence of an order of court directing a loan of the ward's money or such an investment as the one above alluded to, is alone sufficient to entitle the ward to refuse to accept it. Neither, in our judgment, does a subsequent intermediate approval protect the guardian to the same extent as an original order directing the loan or investment.

The guardian has power to make investments by loan, and to expend money for repairs, and for the protection of the estate in his hands, generally and ordinarily, without an order of court. But in doing so, he runs the risk of having his acts disapproved by the court. The difference between an investment made with, and one made without a previous order, affects only the rights of the ward and the liability and risk of the guardian. If the latter secures an order directing him to make a particular loan or investment, it is reasonably clear, we think, that he will be protected, even if misfortune should follow the investment. In such case the investment would not be subject to attack by the ward upon final settlement. But where the guardian acts without an order, he is held to a more strict accountability, and the investment stands so far at his risk that the ward may, upon final settlement, question its character and the prudence and frugality of the guardian in making it, and cause the latter to be surcharged with money loaned and lost by reason of inadequate or improper security. (Guardianship of Cardwell, 55 Cal., 137; Gray v. Fox, 1 N. J , Eq., 259; State v. Jones, 89 Mo., 470.)

The cases cited by counsel for defendant in error, upon this question did not involve the effect of an intermediate approval and its conclusiveness upon final settlement. In those cases it was very properly held that as the court could have directed the expenditure, it might ratify it, if deemed beneficial to the estate; and that it might be so approved upon final settlement, thus curing the objection

of want of power in the guardian to do the act complained of. Frankenfield's appeal, 102 Pa. St., 589; Cheney v. Roodhouse, 135 Ill., 257.

The guardian, having had authority to make the investment without an order previously obtained, permitting it, the subsequent intermediate approval thereof stands upon the same footing as approvals of current accounts, or annual settlements of accounts, pending the continuance of a guardianship. It is generally held that such approvals and settlements while *prima facie* evidence of correctness, are not conclusive upon the ward.

Conversations between the guardian and judge of the court preceding the investments and verbal advice of the latter to make them, cannot be held to operate as orders and directions which the statute authorizes the court to make in the premises. They may go to show the guardian's good faith and the knowledge of the judge at the time of entering the orders of approval. But the advice of a judge given verbally under such circumstances is not to be regarded as tantamount to an order contemplated by Section 4922.

The ward excepts to an expenditure of $16,284.00, October 10, 1892, in the purchase of 177 shares of the stock of the Union Mercantile Company, and of $95.00, December 2, 1892, in the purchase of one other share of said stock.

In the first report current following that expenditure, the guardian reported and represented that the stock was purchased, "for the purpose of keeping profitably invested the moneys in his hands as guardian, and for the further purpose of fully protecting the interests of his said ward in the Union Mercantile Company, in which company his said ward already held 342 shares of the capital stock of the par value of $100.00 each." And he reported that the purchase gave the ward a holding of 520 shares, the same being a majority of the stock; and that he believed said purchase was for the best interest of the

estate, and that the price paid therefor was reasonable. The purchase was approved.

It is contended in the first place that the expenditure is prohibited by the constitution. Section 38, of Article 3, of that instrument is as follows:

"No act of the Legislature shall authorize the investment of trust funds by executors, administrators, guardians or trustees, in the bonds or stocks of any private corporation."

It is argued on the one hand that the purchase of the stock aforesaid was in direct violation of this constitutional provision, and therefore unlawful, and the ward cannot be compelled to accept it; that the authority of the guardian to invest and of the court over investments is derived solely from the statute enacted after the adoption of the constitution, and that the court is therefore without power to ratify or approve the investment. On the other hand, counsel strongly urges that the prohibition acts only upon the Legislature, and does not prevent the district court under its general probate jurisdiction from authorizing in its discretion the investment of funds under its supervision in the character of securities mentioned. It is also contended on the guardian's behalf that the purchase was made as reasonable and necessary expenditure to protect from depreciation and loss the large amount of capital of the ward already invested in the company.

The Union Mercantile Company was organized in 1883, and the father of the ward, the late Erasmus Nagle, deceased, was then, and continued to be until his death, the principal shareholder and president of the company. Upon the distribution of his estate between his widow and son, the former received three hundred and forty-one (341) shares of the stock, and the latter three hundred and forty-two (342) shares. A majority of the stock consisted of 501 shares. The guardian had been manager of the company's business since its creation, and was also a stock-

holder.  One J. E. Schooler owned 177 shares and I. C.
Whipple one share.  The latter was employed by the company at a salary of $125.00 per month; and one reason
assigned in the testimony for the purchase of the Whipple
share, was that it was economy to do so, that a saving
might be made in wages by dispensing with his services.

It is no part of our purpose to rehearse the 'large
amount of evidence upon the question of the necessity for
the purchase of said shares of stock by the guardian.
That necessity is placed upon the ground of the peculiar
and rather embarrassing situation which resulted from a
second unfortunate marriage of the ward's mother.  The
man White, to whom she was married, according to her
petitions for divorce filed prior to the said purchase, had
treated his wife in a cruel and shameful manner, had
secured a mortgage upon her home and real estate, and
possession of her stocks and bonds, including the certificates evidencing her ownership of shares in said company,
which had been indorsed to her in blank by the executors
of her former husband's estate.

The guardian testified that White had threatened to
acquire enough stock in the company to control it.
Enough appears in the evidence to show that he had been
conducting himself in a high-handed and somewhat reckless manner.  The company was a going concern engaged
in the mercantile business in the city of Cheyenne.
Judge Lacey, counsel for the guardian, and his legal
adviser during the continuance of the guardianship, testified that he was consulted by the guardian about making
the purchase, and that together they consulted the district
judge about it; that both said counsel and the judge were
acquainted with the transactions of the gentleman referred
to, and after a full consultation upon the matter it was
thought best by all — guardian, counsel, and judge — that
the purchase should be made, and that it would be for the
best interest of the ward.  He testified further that the
reasons for the purchase were that the guardian had been
advised that White had intended to purchase other shares

to obtain a controlling interest with his wife's shares ; and witness believed then that there was danger of his doing so ; that Mr. Schooler was desirous of selling, and would probably sell to any one offering a reasonable price. Judge Lacey testified that he never heard of any other reason for the purchase than the protection of the ward's capital already in the company.

We are satisfied that the evidence discloses that the conditions were such as to afford a careful and prudent man reasonable grounds for fear that the one who had obtained possession of Mrs. Nagle's stock would, if possible, carry out his threat and secure a majority of the stock ; and we have very little doubt that had he done so, it would have proved disastrous to the ward's interest.

With reference to this purchase the lower court found generally for the guardian, and we must assume therefore that upon this issue, it was found by the court that upon the conditions as they appeared at the time, there was just ground for believing that the purchase was necessary to prevent the placing of the ward's other shares in peril by the control going into the hands of one whose management would be detrimental and injurious, and that the purchase was made solely for the purpose of protecting the large amount of the ward's capital already invested in stock of the same company. In view of such a conclusion by the lower court upon the hearing, and the verbal advice of the district judge, at the time of the transaction, and the advice of the guardian's counsel, which goes to show the good faith of the guardian, we do not feel inclined to question his honesty or prudence in the premises. The fact that the stock secured had an independent value is an argument in favor of the reasonableness of the purchase rather than against it.

Expenditures for repairs are upheld on the ground of protection to the capital and property of the ward. The right, and even duty, of a guardian to protect the lands and premises of his ward by reasonable and proper repairs cannot be seriously questioned, although it is, no doubt,

better that he first obtain the sanction of the court.
(Waldrip v. Tulley, 48 Ark., 297 ; Cheney v. Roodhouse,
135 Ill., 257 ; Frankenfield's Appeal, 102 Pa. St., 589 ;
Kilpatrick's Appeal, 113 Pa. St., 46.)

So we think that a disbursement for the protection of
the capital of the ward invested in property other than
lands should be upheld upon the same principle, if the
same should be reasonable and necessary, and beneficial
to the estate.    Upon the ground, therefore, that the pur-
chase was reasonable and necessary, according to the
events occurring at the time, to save the other shares of
the ward from depreciation, if not destruction in value, it
is our judgment that the court correctly refused to sustain
the ward's exception thereto.

In the opinion of a majority of the court, a purchase
reasonably made for such purpose of corporate stock is
not within the constitutional inhibition against the invest-
ment of trust funds in shares of stock of private cor-
porations.    To deny such right of purchase by way of
protection, by reason of the constitutional restriction,
would be to deny the right to buy one share, even if that
alone would be the means of saving a much larger invest-
ment from total loss.    We are averse to thinking that the
restriction goes to that extent.    It is generally held that a
guardian may not invest the funds in his hands by pur-
chasing real estate.    Yet, even where that is held, where
the ward's estate consists partly or wholly of real estate,
and improvements thereon, the right and even duty of
expending money to keep the same in proper repair is
upheld.    Evidently, in such a case, the putting of money
into real estate by way of protection to the capital already
invested therein, is not deemed an investment in real
estate in the sense in which such an investment is usually
prohibited.    The guardian testified that the stock was well
worth ninety-five dollars per share at the time of the pur-
chase.    The price paid for the Schooler stock was ninety-
two dollars per share.    We think that the evidence fairly

shows that the stock was worth the amount paid for it, and that the guardian honestly so believed.

The guardian also claimed credit for the amount of a promissory note representing a loan made by him to Francis E. Warren. The loan was made originally in September, 1892, and renewed by taking a new note in September, 1893, which is the note mentioned in the final report. The note is for the sum of twenty thousand dollars, and bears interest at the rate of eight per cent per annum. The amount of principal remaining unpaid is $19,800. Upon the note there was due at the date of the final report, as accrued interest, $4,550, but five hundred dollars was afterward paid. When the loan was made, the guardian took as collateral security three hundred shares of the stock of the Warren Live Stock Company, a private corporation, and two hundred shares of the stock of the F. E. Warren Mercantile Company, likewise a private corporation. Later, in 1894, the guardian demanded and received as additional security one hundred shares of the stock of the Warren Live Stock Company, making altogether four hundred shares of said stock held by him.

The grounds of the exceptions to this investment which need to be now considered are, ( 1 ) that so far as the collateral is concerned, it is an unlawful investment in the stock of private corporations; ( 2 ) that it is an improper loan upon mere personal security; ( 3 ) that the guardian was not prudent or diligent in making the loan; and ( 4 ) that the guardian was negligent in failing to collect the note and interest by suit or otherwise.

As to the first ground, a loan to an individual for which a promissory note is executed requiring the payment absolutely of the money loaned with interest, secured by shares of stock of a corporation, does not constitute an investment in the stock of a private corporation, at least, within the sense of the constitutional provision, or of any rule of law forbidding an investment by a trustee in such

stocks.    Lovell v. Minot, 20 Pick., 116.    It is no more
an investment in the stock than  a loan represented by a
note, secured  by a real estate mortgage, is an investment
in real estate.    Whether, in  view of the consequences of
non-payment  a  loan  upon  corporate  stock as  collateral
should be deemed injudicious and  improper, is  altogether
another question.    In  case of  a loan upon mortgage the
lender might be compelled upon  foreclosure  to  take  the
property; and  likewise  he  might  be  bound  in protecting
his own interests to take the stock where he has it as se-
curity.    But  as  such  possible  results  do  not operate to
render the loan upon mortgage an investment in the prop-
erty mortgaged,  so they do not in case  of  collateral stock
make the loan an investment in the stock itself.    As was
said by Chief Justice Shaw, in  the case last cited above,
'' It was a loan at a fixed interest of  six per  cent, and the
transaction no further exposed the capital to  the  hazards
of trade than  as it affected the value of the pledge.''

It is earnestly  insisted  that  a  guardian  commits  a
breach of  duty by loaning upon personal securities.    The
general rule is that a guardian, like all trustees, in the
investment of funds in his hands, must  conduct himself
faithfully and exercise  a  sound discretion.    He is bound
to act honestly and prudently, and in the execution of his
trust to exercise the care and judgment of  ordinarily pru-
dent and intelligent men in their own affairs.    He is  not
an insurer of the property, and will not be  chargeable for
a  mere error of judgment; nor for incidental injuries and
losses not occasioned through his negligence  or  lack of
prudence.    2  Pom. Eq. Jur., 1070; Harvard College v.
Amory,  9  Pick., 446.    '' Guardians, acting  within  the
scope of  their authority, are bound  to the  observance  of
fidelity,  and  such  diligence and  prudence as  men of
ordinary intelligence observe in managing  their own af-
fairs.''    Woerner on Guardianship, p.  197.    '' Thus the
general rule is  recognized  everywhere that  a  guardian,
when investing  property in his  hands, is  bound to act
honestly and faithfully, and to exercise a sound discretion,

such as men of ordinary prudence and intelligence use in their own affairs." *Id.*, p. 198. "Trustees are justly and uniformly considered favorably, and it is of great importance to bereaved families and orphans that they should not be held to make good losses in the depreciation of stocks, or the failure of the capital itself, which they held in trust, provided they conduct themselves honestly and discreetly and carefully, according to the existing circumstances in the discharge of their trusts. If this were held otherwise, no prudent man would run the hazard of losses which might happen without any neglect or breach of good faith." Harvard Coll. v. Amory, *supra;* 2 Beach on Trustees, 525.

Referring to the general rule, that a trustee is to observe how men of prudence, discretion, and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested, Chief Justice Gray in a Massachusetts case said, "If a more strict or precise rule should be deemed expedient, it must be enacted by the Legislature." Brown v. French, 125 Mass., 410.

In England and some of the States, the courts have laid down more precise rules, and in the light of experience have dictated the character of securities which a court of equity will deem prudent for a trustee to take. In some of the States the statutes have given directions upon the subject. In Beach on Trusts and Trustees it is said, "But in the absence of specific directions in the instrument, of equitable rules or statutory enactments, trustees must act in good faith, and in the exercise of a sound discretion. Where there are no specific rules for their guidance, trustees must be governed by the general principles which courts of equity have enunciated for their direction." Sec. 527.

The English rule forbidding the investment of trust funds in anything but public, or real estate securities, has been followed in all its strictness, apparently, in the

States of New York, New Jersey, and Pennsylvania. But Massachusetts refused to adopt it as inapplicable to the conditions in that State. In Vermont the trustee was held only upon the general rule of good faith, diligence, and care, the court in one case saying : "In this country the title to real estate, especially in new settlements, is uncertain and unstable, and desirable mortgages cannot always be obtained. We had no public stocks in which the faith of the government was pledged, until the late war, and they now bear such premiums, and many of them liable to be called in and replaced by those bearing less interest, that it is often impracticable or undesirable to make investments in such property, so that the only practical rule is to require of a trustee good faith, diligence, and care." Barney v. Parsons, 54 Vt., 623.

In New Jersey, in one case, it was said by the chancellor with reference to the policy of adopting the strict English rule, "I should feel some hesitancy in adopting it to the extent to which it is carried in their courts. The situation of the two countries differs very materially in many respects, and especially as it regards · the facility of investments; and what may be a prudent rule of policy in one country may not be in another." Gray v. Fox, 1 N. J. Eq., 259. In some of the States, loans upon personal securities are expressly permitted by statute.

In this State the statute does not define specifically the securities which a guardian may take. He is required to manage the estate frugally and without waste. The court may direct and authorize investments in real estate, "*or in any other manner most to the interest of all concerned.*" No rule had been laid down by the court of last resort in this State. Assuming that the guardian, in fact, acted prudently and in good faith, the question now is, should we say that, as a matter of law, the guardian acted illegally in accepting the securities objected to; or that the acceptance of such securities must be conclusively

regarded as a lack of that prudence and care which a trustee is bound to exercise.

Such a conclusion on our part, it must be conceded I think, would, at least, be harsh, and unjustly burdensome upon the guardian, when it is remembered that he acted honestly, under the advice of able counsel, and after consulting with the judge of the court having supervision over the estate, and who, the evidence discloses, had previously, as judge, directed the management of other large estates, and particularly of a larger guardianship estate than this one. But we are not of the opinion that the inflexible rule adopted in England and in a few of the States in this country, should be adopted in this State. The statute is itself expressed in the most general terms. Experience may have proven in some places that real estate values are the most stable, and that outside of the public securities, mortgages upon real estate furnish the most reliable investments, having regard to income and the preservation of the principal. While we are far from holding a loan upon real estate to be injudicious, because we esteem it as one of the safest of securities; nevertheless, it is no doubt the fact, that no other class of property in this state, has been so subject to fluctuation, and even great depreciation in values. The greater amount of re-invested capital in this State is not to be found in landed properties, but in personal property, such as live stock. The quantity of land outside of the towns under private ownership has been and still remains comparatively small, although in the last few years, it has doubtless been largely augmented. We are inclined to the opinion that comparatively as much loss has occurred in the case of loans upon real estate as in any other class of securities, notwithstanding that the loans were prudently made according to the conditions and values existing at the time. It has not been possible in this state, at all times to obtain desirable loans in large amounts upon real estate. In the brief of counsel for plaintiff, in error in

the discussion of one of the loans excepted to, made upon the security of a mortgage upon real estate in Cheyenne, they say, " The testimony of all the witnesses show that at this time it was very difficult to borrow money upon Cheyenne real estate. *As a rule*, people who had money to lend, were not putting it out on such securities; the evidence establishes this conclusively, and the experience of the past few years simply demonstrates that these people were prudent, discreet, and wise."

The live stock company owned a very large number of sheep, and also a considerable number of cattle and horses, besides large tracts of land; some of the land being held under contract with the railroad company. The value of their property was over $800,000, and their debts aggregated $150,000, and the amount of its capital stock outstanding was $538,500. Temporarily during the continuance of the loan, the company went into a receivership, owing to the depreciation in the values of sheep and wool, but they soon emerged from their financial difficulties, so that not only when the loan was made, but at the time of the hearing, and up to the present occasion probably, the company was entirely solvent, and, according to the evidence, the stock was worth par when the loan was made. From 1885 to 1893 inclusive the company had regularly paid six per cent annual dividends. The Mercantile Company is capitalized at $150,000, was at all times solvent, and had paid annual dividends, during most of the time. The business of this company was established in 1867, but was not put into a stock company until early in the eighties. Its stock was also worth par.

The guardian therefore had for the loan of twenty thousand dollars, sixty thousand dollars of dividend paying stock worth par. In 1883 Mr. Warren borrowed from the ward's father fifteen thousand dollars upon the security of thirty thousand dollars, par value, of the Mercantile Company stock; and from that time until the elder Nagle's death, the latter made a number of loans to Warren

taking stock in each of said companies as collateral. The last loan so made was for $10,000, secured by $15,000, of the stock of the Live Stock Company, and $10,000, of the stock of the Mercantile Company. This loan was paid by Warren in June, 1892, to the administrators. Mr. Robins, was one of the administrators, had been familiar with the business affairs of Mr. Nagle, and had personal knowledge of some of the loans he had made to Mr. Warren.

It appears that stocks in these companies were used by Mr. Warren as collateral with many banks and individuals. It was usually received as collateral upon the basis of two to one. The banks and individuals accepting such stocks as security for loans were located or residing in Denver, Chicago, or the New England States; and it is evident that they were prudent and conservative in business matters. Mr. Warren, in his testimony furnished their names, and the amounts of the several loans. They varied in amount from $2,500 to $20,000. In respect to this loan to Mr. Warren, no loss has occurred. Although some interest remains unpaid, the security is apparently more than sufficient to cover principal and interest. Mr. Warren's testimony is that he is solvent, and the owner of considerable other property. A review of the evidence has strongly impressed the opinion upon us that the probabilities of any loss to the ward growing out of this loan are exceedingly slight, if any.

Before making the loan, the guardian examined the books of the two concerns and was convinced they were sound, and the stock worth par. He took the advice of his counsel, and the judge. The loan was made in 1892, renewed in 1893, and for four years thereafter continued with the knowledge and consent of the court, as shown by the approval of the guardian's various reports.

Under all these circumstances we perceive no valid reason for surcharging the guardian with the money invested in the Warren loan.

It is probably true that a security will not always be

deemed safe for the investment of trust funds, on the sole ground that an ordinarily prudent man might be satisfied with it when investing his own money, because, as has been said, an individual may be willing to assume some risks as to his own capital. It may also be conceded that stocks in private corporations furnish abundant instances of unsafe and unreliable securities, by reason of fluctuation in values caused by the hazards and uncertainties of trade, or mismanagement. In this direction, a trustee should be held to the exercise of such caution and wise discretion as a prudent, conservative man would bring to the conduct of his own affairs with regard to the ultimate preservation of his capital employed in loaning out upon interest. It will be incumbent upon the trustee before accepting such stocks as collateral to inform himself respecting the character of the concern for soundness, management, and genuineness. It should not be a fictitious or experimental company. In the case at bar the live stock corporation was engaged in that business which constitutes and has ever constituted the principal industry of the state. The value of its shares of stock was not prospective, but was based upon actual ownership of substantial and valuable properties, productive in their nature, and capable of material increase, neither fanciful nor speculative. The evidence in our judgment satisfactorily establishes the prudence, care and good faith of the guardian in the premises.

While we observe numerous cases among the authorities condemning investments by trustees in the purchase of stocks in private corporations, it is perhaps significant that no case has been cited, or come to our attention, where a loan upon such securities as collateral, has been denounced as unlawful.

It is argued that this loan should be charged back upon the guardian for his failure to collect the same; it having been overdue for some time, and the interest having been allowed to accumulate. Upon this subject it is clear that the guardian sought, by frequent demand, to make col-

lection. He did not resort to legal measures because, as he testifies, it was not deemed advisable. It was believed that indulgence would more surely result in ultimate recovery of the money, than a forced sale of the securities. By reason of the panic which swept over the country, and affected the local community, causing disturbance in the financial affairs of many of the most substantial business men, and in the values of even the better class of properties, borrowers were necessarily slower than usual in meeting their obligations. It was not deemed for the best interest of the estate to force collections by taking these securities. Payment in money was the desired object and forbearance was employed as more liable to secure that object. The securities were not becoming less valuable; and it was the belief of the guardian, as well as that of his counsel, and the judge with whom he consulted, that the debtor would pay if a reasonable time was allowed therefor, and thus the necessity be saved of sacrificing his property, and taking it in lieu of the money itself.

The court found generally for the guardian, which included a finding that in this respect the guardian had not been negligent. In a case in California it was said, "There is no finding that the balance due upon this note was lost by the negligence of the administrator. The failure to push the collection of the note may have been negligence, but is not necessarily so. It frequently happens that indulgence to a debtor is a matter of prudence on the part of the creditor, and the court does not find as a fact that the administrator in this instance failed to exercise a reasonable judgment in failing to enforce the collection of the note by process of law." And where, in the absence of such a finding, the court had charged the administrator with the balance uncollected on the note, it was held error. *In re* Moore's Estate, 31 Pac. 584.

We do not think, in view of all the facts, that the guardian should be surcharged on account of his failure to pursue coercive measures; especially as it does not

appear that there has been or will be a loss, and even if there should be, that it will have been the result of the guardian's neglect in failing to use the processes of the law to enforce payment.

The ward excepted to a loan of twelve thousand dollars to Henry Altman of Cheyenne, this State, made April 10, 1893. The guardian received as security for this loan a mortgage upon twenty-five acres of land near the city of Salt Lake, Utah. Altman conveyed the property by deed to the guardian, taking back a separate agreement of defeasance.

Both parties took depositions of a large number of witnesses at Salt Lake, to show the value of the land at the time of the loan. A wide difference of opinion existed between the witnesses upon that question, the opinions varying from $200 to $1,000 per acre. Several witnesses thought the value at the time mentioned was from five hundred to eight hundred dollars per acre. With substantial unanimity, however, they all agree as to the following facts: Whatever value the land possessed at all commensurate with the amount of the loan was entirely speculative. The witnesses who fix the value as high as five hundred dollars per acre, state that such value was a speculative one. Mr. Altman, in perfect accord with the other witnesses, testified upon cross-examination, that the only thing which gave value to the land was the hope and expectation that Salt Lake City might build out in that direction, whereby -it would be needed for building or factory purposes. It was country property, and as such possessed an intrinsic value, because of its adaptability to farming or gardening pursuits, but too insignificant to furnish adequate security for so large a loan as twelve thousand dollars.

The speculative character of its value depended not upon its increased cultivation or development as country property, or the probabilities of a larger demand for country property as such; but upon its becoming in time city property, and desirable and sought for as a site for

city homes or factories. Prospective buyers would be expected to pay the higher value put upon the property as a matter of speculation only. Mr. Altman had paid $7,000 for the property in 1888 or 1889, and in those years even, real estate prices in Salt Lake City were somewhat inflated on account of a spirit of speculation then prevalent.

The speculative value of the land according to all the witnesses had steadily declined since 1890, so that in 1893 the depreciation was fully one-third; and according to some of the witnesses, the depreciation, at least, rested upon something substantial, as they declare that the population of the city had largely decreased between 1890 and 1893.

Upon the facts above recited, which are plainly disclosed by the evidence, practically without contradiction, the question is, Should the ward be required to accept the Altman Loan; and we are constrained to hold that he should not. Had the guardian in the matter exercised his usual prudence and sagacity, and made such inquiries as the conditions demanded, we are satisfied that he would have been convinced that the value at all proportionate to the loan placed upon this property was fanciful and fictitious and founded upon a hope and expectation too uncertain of fruition, to entitle it to consideration.

The investigation of the guardian was confined to an inquiry of a gentleman who had visited Salt Lake City, and from him the information was received that he was told Mr. Altman had been offered eighteen thousand dollars for the land. In addition to that Mr. Altman stated to the guardian that he had refused an offer of twenty-four thousand dollars. Considering the character and situation of the property, and the speculative quality of its value relied on, the investigation of the guardian was not thorough enough to absolve him from responsibility.

With the decline or loss of confidence in the growth of the city so as to take in this and neighboring lands, spec-

ulation in such lands would correspondingly decline or altogether cease, and the values depending thereon suffer accordingly. This is a matter well known to prudent and conservative men. While such men may be willing at times to embark their own money in such lands as well as in other speculative enterprises with the hope of making larger gains than are otherwise possible, they are aware that they run the risk of having a property of small actual value on their hands when the fever of speculation shall have run its course.

We are of the opinion that such speculative values as are illustrated by the Altman property are not such as an ordinarily prudent man having regard to the probable safety of the capital, would rely on in loaning out his money; and that they are too unsubstantial, uncertain, and unreliable for consideration in the investment of trust funds.

The guardian may have so far relied upon the financial worth, standing, and integrity of Mr. Altman, as to have induced a relaxation of his usual prudence. Whatever may have been the reason, he allowed himself to make the loan without resorting to that character of inquiry which would have developed the unsatisfactory standing of the supposed value of the property, and convinced him of its inadequacy. The rights herein as between the guardian and ward must be determined upon the basis of the securities.

The exception to this loan on the ground of inadequacy of security, should have been sustained, and the judgment as to this investment must therefore be reversed.

The application of certain general and well settled rules will determine the amount to be charged against the guardian, on account of this loan. He is accountable for only such interest or profit as he might have obtained by the exercise of reasonable skill and exertion in the management of the fund. Interest is not charged upon a trustee as a punishment, but only to attain the actual or presumed gains, and to make certain that nothing of

profit or advantage shall remain to the trustee beyond his commissions or compensation. He is liable for all interest actually received, as whatever gain or profit may flow from the employment of the ward's funds cannot be allowed to enure to the benefit of the guardian. Woerner on Guardianship, Sections 220-224; Cruce v. Cruce, 81 Mo., 676; Thompson v. Thompson, 92 Ala., 545; Estate of Holbert, 48 Cal., 627; Estate of Cousins, 111 Col., 441.

The guardian testified that he always had money on hand, and found it difficult to obtain good loans, although he refused none that he believed to be good; that during a large part of the time a panic swept the country, and this interfered with securing safe loans. The ward made no attempt to show that the money could have been otherwise safely invested, or loaned out, by the exercise of reasonable skill and diligence. The guardian's testimony is uncontradicted. There is nothing therefore upon which to base a charge against him for legal interest from the time of the loan, or any other rate of interest as such. He actually received $1,200, from Altman as interest prior to the final report, and that has been accounted for, and gone into the estate. He received the further sum of $1,000, since the report. If this latter payment has not been turned over to the ward, the guardian should be charged with the same, together with the sum of $12,000, the principal. If the ward has already received the $1,000, then the charge against the guardian will be the principal only, or $12,000. The guardian will be permitted to retain as his own the Altman note and the securities therefor, and the judgment by appropriate provision should secure them to him.

The Masten loan is excepted to. This was a loan of $5,000, to George G. Masten and wife, upon the north half of two lots located near the business center of the City of Cheyenne, less than a block from the leading hotel, and diagonally across the street from the opera house. The improvements upon the place were of little

account, producing only a small income. There can be no doubt of the guardian's prudence and diligence in making this loan. He owned an interest in the other half of the lots, and by inquiries made at the time, and personal acquaintance with the property, he was well advised concerning its value, and its adequacy as security for the loan. The property had been appraised in a partition suit for more than $14,000, and Mr. Masten had paid a co-tenant $7,200, for the latter's half interest. We think the evidence fully establishes that the lot was good security at the time of the loan, and is probably now worth the amount of the loan, or nearly so. At least, if any loss shall occur, it will not be the result of the guardian's carelessness in loaning the money.

The same may be said in respect to the loan of $1,800, to Underwood upon 400 acres of lands constituting the ranch of the borrower, with water rights, and the loan of $1,500, to Bonser upon improved Cheyenne real estate.

Regarding the Masten, Underwood, and Bonser loans, it is charged that the guardian was negligent in not forcing collection of principal and interest at maturity. What was said in this connection when discussing the Warren loan is equally applicable to these investments. The situation had not become any worse through the indulgence of the guardian, or his failure to foreclose the mortgages. His forbearance was with the advice of the counsel and the judge of the court. We do not think he should be charged with any portion of these loans; but are of the opinion that the judgment of the court as to them is fully sustained by the evidence, and should not be disturbed.

Some statements were brought out in the evidence to the effect that the value of the Masten property was speculative.

A clear distinction in that respect, however, existed between that property and the lands of Mr. Altman. No doubt there is usually more or less of a speculative or prospective quality attaching to the values of all real

estate, and more particularly to that which is vacant, or so slightly improved as to furnish no more than a very limited income. But where, as in the case of the Masten property, it is in a location suitable for business or residence purposes within a city, it possesses an actual value for those purposes.

Over objection, the court permitted the guardian to give in evidence the fact of his consultations with the probate judge prior to the several investments, and the verbal advice of the judge respecting them. The evidence was offered and admitted, as the record shows, upon the question of the good faith of the guardian. For that purpose we think the evidence was admissible. For the same reason, and as tending to show the exercise of prudence on the guardian's part, the evidence was admissible of previous loans to Mr. Warren by the father of the ward, who was also a conservative business man, upon security of stocks in the same concerns as that accepted by the guardian in connection with proof that the guardian had personal knowledge of those loans.

The district court found that the ward's exceptions were unfounded, and that the guardian was entitled to reasonable counsel fees for resisting said exceptions. The court found that twenty-five hundred dollars was a reasonable counsel fee, and that the guardian had incurred a liability for that amount for services of counsel in resisting the exceptions, and thereupon ordered that he have and recover the same from the ward.

That the court had authority to indemnify the guardian for expenses of accounting, and for reasonable expenses including counsel fees incurred in order to discharge himself of his trust, is well settled. *In re* Carman, 2 N. Y. Supp., 690; Kingsbury v. Powers (Ill.), 22 N. E., 479; Woerner on Guardianship, 351.

Counsel for plaintiff in error do not contest the amount of the allowance for counsel fees. The court heard testimony as to the amount which would constitute a reasonable counsel fee under the circumstances, and

allowed the smallest sum fixed by any of the witnesses. One witness stated that a reasonable fee would be three thousand, and another four thousand, dollars.

There is nothing in the testimony or record to indicate that had the exceptions to the Altman loan been sustained a less sum would have been awarded. Neither is there anything in the testimony which furnishes a basis for a reduction of the amount by this court. The guardian even as to the Altman loan, acted in good faith, both in making the loan and in resisting the exceptions thereto.

The court awarded to the guardian his costs, amounting to $82.30, expended outside of counsel fees in resisting the exceptions to the Altman loan. As that part of the judgment which overruled the exceptions to that loan must be reversed, the guardian will not be entitled to those costs, but the ward should be allowed his reasonable costs actually expended in respect to that loan, but not including counsel fees.

The judgment will be reversed in so far as it denied the exceptions to the Altman loan, and in all other respects affirmed. As to the Altman loan, the cause will be remanded with directions to the district court to charge the guardian with the principal of the loan, viz.; $12,-000.00, and the $1,000.00 in addition thereto which has been received by the guardian since his final report in case the same shall not already have been delivered to the ward; and permitting the guardian to retain as his own the Altman note and securities.

*Affirmed in part and Reversed in part.*

KNIGHT, J., concurs.

CORN, JUSTICE, (dissenting in part).

I am unable to concur in all of the conclusions reached by a majority of the court in this case, and some of the questions are of such importance as to require, in my

opinion, a brief statement of what I deem to be the correct view.

The guardian purchased 177 shares of the stock of the Union Mercantile Company, a private corporation, paying therefor $16,284.00 out of the trust moneys in his hands. He also loaned to Mr. Warren $20,000.00, taking as the only security therefor shares of the Warren Live Stock Company and of the F. E. Warren Mercantile Company, private corporations. The constitution of this state provides that "No act of the Legislature shall authorize the investment of trust funds by executors, administrators, guardians, or trustees, in the bonds or stocks of any private corporation." Art. 3, Sec. 38.

It is contended, as I understand, that while this provision is an inhibition upon the Legislature, it does not so operate in restraining and controlling the action of the courts. But probate courts take all their powers from the statutes. Grimes v. Norris, 6 Cal., 624; Brodus v. Thompson, 6 H. & G., 126; State v. Warren, 28 Md., 355; Fairfield v. Gullifer, 19 Me., 361; Fowle v. Coe, 63 Me., 248; 1 Woerner Adm., 142. And the case is not different where probate jurisdiction is conferred upon a common law court. 1 Hill (S. C.), 55. *In re* Burton's Est., 63 Cal., 36; Est. of Kimberly, 97 Cal., 281; Smith v. Westerfield, 374. Therefore, as the district court, sitting in probate, has no powers except such as are conferred by statute, it seems to follow necessarily that it cannot be in possession of any powers which the Legislature is prohibited by the constitution from conferring.

It is true, as urged, that some of the States permit, and perhaps encourage, the investment of trust funds in such stocks, the practice having been authorized by legislation, or having grown up with the industrial development of such states. And the right of each State to adopt its own policy in the matter, cannot be questioned. But the provision of our constitution, in my opinion, declares the public policy of this State upon the subject. At the time

of the adoption of the constitution, many companies had been created for the purpose of raising and dealing in cattle and other live stock, heavy losses had occurred and many of them had failed, or their failure was impending. From the nature of the industry at that time, it was difficult for stockholders or others to ascertain the precise condition and prospects of the business. It is reasonable, I think, to conclude that it was the purpose of the framers of the constitution to forbid the investment of trust funds upon the security of the stocks, or bonds of these or similar companies.

But it is contended that a loan of money to an individual upon the security of such stocks is not an investment in them within the meaning of the constitution; that it is no more an investment in the stocks than a loan of money upon mortgage security is an investment in real estate. And it may be conceded, perhaps, that the latter is not an investment in the real estate represented by the mortgage, and that the former is not an investment in that portion of the property of the company represented by the shares of stock. But, it is, in my opinion, none the less in the one case an investment in the mortgage and in the other an investment in the shares of stock. The definition of the word "investment" given by the A. & E. Encyclopedia of Law, is as follows:—

"Investment, with reference to money, is the loaning or placing of it to produce interest or profit. With respect to trust funds, it is the loaning or placing of them by the trustee to produce interest or profit for the benefit of the *cestui que trust.*" 11 Am. & Eng. Ency. of Law, 814. "A sum is invested whenever it is represented by anything but money." The Parker Mills vs. Comr's, 23 N. Y., 242. In any case the guardian or other trustee would be slow to contend that the sum loaned was represented solely by the promissory note of the borrower and not at all by the mortgage or by the shares held as collateral. And the court would be slow to permit him to turn over the note unaccompanied by the security in

the place of, and as representing, the sum loaned. In my view of it, it is very clear that the investment in the one case is in the note and mortgage, and in the other, in the note and stocks held as collateral.

And the distinction sought to be made is incapable of being practically maintained consistently with the safety of the fund so invested. For, if it should prove necessary for the guardian to dispose of the stocks in order to collect the amount of the indebtedness he would find himself in the position of being compelled to become a purchaser of them out of the trust fund in violation of law, or at the mercy of bidders interested only in obtaining them at the lowest price possible.

In my opinion these investments were in violation of law, and the exceptions of the ward should have been sustained upon that ground.

### ON APPLICATION FOR COUNSEL FEES.

PER CURIAM.

Plaintiff in error sought a reversal upon proceedings in error of a judgment of the District Court of Laramie County rendered upon exceptions of the Plaintiff in Error to the final report of his Guardian, the Defendant in Error. In this court the judgment was affirmed in part, and reversed in part.

Application is now made by defendant in error for an order to be entered by this court allowing to him as guardian necessary and reasonable expenditures in the employment of counsel in defence of his accounts in the proceedings in error in this court. The jurisdiction of this court in this cause is appellate only. The question before us was whether the district court erred in its judgment rendered herein, and that question we have decided. In respect to the matters in issue between the parties to these proceedings this is not a court of original jurisdiction, and in this kind of case we are of the opinion that authority is not conferred upon this court by law to make an accounting and original allowance for counsel

fees. As was said in Kingsbury v. Powers, 26 Ill. App., 574: "to determine the proper amount of such allowance would involve the presentation to this court of issues of fact to be maintained by original evidence, and would be in substance an exercise of original as distinguished from appellate jurisdiction." We think that to be a correct statement of the law.

At the time of making the application, counsel for the defendant in error offered evidence as to the necessary expenditure for counsel fees in this court and the reasonableness thereof. The same was received subject to objection, reserving our decision as to its admissibility for further consideration. For the reasons already stated we think the evidence inadmissible in this court; and for the same reasons the application will be denied.