Strafford, }
June 6, 1905. }

STEVENS, *Ap't*, v. MESERVE.

The guardian of a minor heir has authority to agree to a division of the ancestor's personal estate in kind, without first obtaining an order from the probate court, when he is satisfied that such a course will be for the interest of his ward; and if his conduct in thus acquiring the ward's inheritance be challenged, it is sufficient for him to show that he acted in good faith and with reasonable care and prudence.

A guardian who agrees in behalf of a minor heir to a division of the ancestor's personal estate in kind is at liberty to accept notes and securities other than those in which he would be required by statute to invest funds which came into his hands, if the interest of his ward so demands.

Evidence that stocks and mortgage notes were taken as part of a ward's inheritance in accordance with the advice of counsel, that the original holder regarded them as safe, and that trustees and bank officials were accustomed to invest in similar securities, is competent upon the question of the care, prudence, and fidelity of the guardian.

In making investments of his ward's estate, a guardian is only required to satisfy himself, by an investigation conducted in good faith and with reasonable care and prudence, that the value of mortgaged realty is at least double the amount of the loan secured thereby.

A guardian who accepts notes in settlement of a desperate claim in favor of his ward, with full knowledge that the value of the mortgage security is less than double the amount of the obligations, is not chargeable as matter of law with the loss resulting from the transaction.

PROBATE APPEAL, from a decree allowing the defendant's account as guardian of the plaintiff. Trial by the court. Transferred from the February term, 1904, of the superior court by *Chamberlin*, J.

Nathaniel Stevens died in 1887, and was survived by a widow and the plaintiff, his only child and heir, then a minor. The defendant was appointed guardian of the plaintiff, April 13, 1888. The decedent left personal estate appraised at $109,456.54, of which $19,221.50 was in stocks of banks and other corporations, $4,224.18 in overdue notes of doubtful value secured by mortgages of real estate in South Dakota, and $84,263.41 in notes secured by mortgages of real estate located in Kansas, Missouri, and Arkansas, supposed to be good. The administrator collected only a portion of the notes. In May, 1890, he settled his final account with the judge of probate, by which it appeared that there was a sum of about $116,000 for division between the widow and the heir. Upon the settlement he divided the cash on hand

and the notes and stocks that had not been collected or disposed of,—one third to the widow and two thirds to the plaintiff,—taking from the widow and the defendant as guardian of the plaintiff receipts for the same, as if the transactions took place by the payment of money. The defendant thus received and receipted for South Dakota notes and mortgages amounting to $2,500, other notes and mortgages amounting to $34,668.79, and stock of the Gossard Investment Company of the par value of $13,000 and appraised at that sum. There was no order by the judge of probate for the transfer of these notes and stock to the defendant. The defendant did not understand by the transaction that he was investing funds of his ward, but understood that he was simply taking a transfer of property that his ward inherited from the decedent. He believed it was a prudent and safe thing to do, and was for the interest of his ward.

At the time of the division it was agreed between the widow and the defendant that the South Dakota notes and mortgages above mentioned, which were regarded as of little value, should be divided *pro rata* between them ; that each should collect as much as practicable upon them, and if in the end the division did not prove equitable, one should pay the other a sufficient sum of money to produce an equitable division. The defendant collected $565.27 upon these notes. The other notes and mortgages were believed to be good, and the interest due upon them had been fully paid. Accompanying each note and mortgage, there was a written application by the borrower for the loan, an appraisal of the property offered in mortgage by some one supposed to be acquainted with it, a sworn certificate of its value, and an abstract of title. The defendant carefully examined the papers before taking the notes, and became satisfied that each of the notes, excepting the South Dakota notes, was secured by a mortgage of real estate at least double the note in value. The Gossard Investment Company was a corporation organized for the purpose of negotiating loans on farm, village, and city properties in the West. The stock at the time of the division was a good, paying security, and could have been sold in the market at par. The defendant regarded it as a good investment.

The defendant from time to time invested in similar western notes and mortgages money that came into his hands as guardian, first satisfying himself in every instance, excepting those next hereinafter mentioned, that the real estate mortgaged to secure the loan was double the note in value. He accepted notes not thus secured, amounting to about $3,000, in settlement of claims against his western agent for appropriating money without authority. He made every reasonable effort to collect the claims

otherwise; but failing to do so he accepted the notes, fearing that if he did not he would lose the whole claim.

Nathaniel Stevens was reputed to be a capable investor of money. For several years prior to his death he had invested largely in western notes and mortgages, doing the business in part through the Gossard Investment Company. A short time before his death he showed the defendant some of his securities, informed him of the method in which he did the business, and recommended the Gossard Company and another similar company as safe, sound, and reliable. He advised his wife to invest in such securities and to continue to deal with the Gossard Company and the other company referred to. Before accepting the notes and stock and making the investments, the defendant talked with the widow, the administrator, the cashiers and other officers of banks, and with trustees and other large investors in the community, about such investments. He also consulted able lawyers relative to his right to accept the Gossard Company stock from the administrator and to invest the money of his ward in western notes and mortgages, and was advised by them that he could lawfully do so. He was assured by the judge of probate, who appointed him guardian, that he had a legal right to receive the Gossard Company stock as a part of his ward's share of the estate. In managing his ward's estate the defendant acted in all ways with absolute good faith. He accounted for every dollar that he received; he was prudent and careful in all expenditures; and, considering the circumstances in which he was placed, the information that he had and could obtain, and the sources from which he received information, in all that he did he acted as a reasonable, prudent, and careful man.

The real estate mortgaged to secure notes that were overdue and unpaid on January 28, 1901,—the date as of which the account was settled,—was not double the notes in value; but the defendant was not in fault for not knowing this fact. The hard times in Kansas, Missouri, and Arkansas, between 1890 and 1893, caused great depreciation in the value of the class of property which was mortgaged to secure these notes, and some of the notes have not been paid. The Gossard Company became insolvent, and the defendant has received nothing upon the stock since 1892.

The judge of probate allowed the defendant's account, in which he was charged with the cash and property received from the administrator and the cash subsequently received in the management of the property, and was credited with the money invested by him as above stated, with the notes and mortgages remaining uncollected, and with the Gossard Company stock. The superior court affirmed the decree of the judge of probate, with a provision

that if, according to the law, the guardian must account in cash for the property received from the administrator and the investments subsequently made by him, together with interest thereon, he should be charged with a balance of $108,323.26, as of January 28, 1901, less $1,000 a year for services, expenses, and commission, and less sums paid agents and attorneys, instead of the sum with which he was charged by the judge of probate.

*Leslie P. Snow* and *Alfred S. Hayes* (of Massachusetts), for the plaintiff.

*John Kivel, George S. Frost,* and *James W. Remick,* for the defendant.

CHASE, J.   From an early date there have been statutory provisions in the province and state relating to the settlement and distribution of the estates of deceased persons.   The earliest statutes followed in most respects the statute of 22 and 23 Car. II, enacted in 1670.   See 1 N. H. Prov. Laws (Batch. ed.), *p.* 566 ; Prov. Laws, *ed.* 1771, *p.* 104 ; Laws, *ed.* 1815, *p.* 207.   They required the making of an inventory of the estate, the administration of it according to law, an accounting, and a distribution of the "surplusage" or residue among the widow and heirs in certain proportions.   The first provision relating to the sum at which the administrator should account for the personal estate is that of section 10 of the act of February 3, 1789   (Laws, *ed.* 1815, *p.* 210), which provided that he should account for it " as the same shall be appraised," unless the judge ordered it sold.   This provision, however, was materially changed by the provision of the act of February 15, 1791, "that no administrator shall be obliged to account with the judge of probate for the appraised value of any personal estate, if such administrator shall produce the personal estate so appraised."   Laws, *ed.* 1815, *p.* 216, *s.* 3.   The administrator was required to pay the debts and legacies in specie, if such he had " as assets in his hands " ; and if not, he could pay them in the personal property on hand, or expose such property to the creditor or legatee to be levied upon.   Prov. Laws, *ed.* 1771, *c.* 42, *s.* 3 ; Laws, *ed.* 1815, *p.* 213, *s.* 24.   If the residue of the personal estate after the payment of the debts, etc., consisted of property other than money, and the administrator produced it, the division among the heirs must have been of the property in kind.

Such was the state of the law at the time of the revision of the probate laws in 1822.   Laws 1820, *c.* 87 ; Laws 1822, *cc.* 27–34. Section 4, chapter 31, Laws 1822 (Laws, *ed.* 1830, *p.* 333), provides that "the executor or administrator shall account in money

for the debts due the deceased by him received, or which by due diligence might have been collected and received. And he shall also be charged in money with the appraised value of the goods and chattels of the deceased," or, if they are sold under a license, with the proceeds of the sale: "*Provided, nevertheless,* that if there be any personal estate specifically bequeathed, or undisposed of at the request of the heirs or legatees, or preserved for their greater benefit, and not wanted for the payment of the just demands with which the estate is chargeable, the executor or administrator shall be discharged therefrom by producing the same and delivering it over to the heirs or legatees to whom it belongs." Upon the general revision of the laws in 1842, the foregoing provisions were re-enacted in sections 5, 6, and 7, chapter 159, Revised Statutes, without change excepting in form. The provision relating to the reservation of personal property from sale was put in a section by itself (*s.* 6), and reads in part as follows: "Any property may be reserved at the sale, unless so needed [for the payment of debts], for the benefit or upon the request of the heirs or legatees, and the administrator shall be discharged by delivery thereof to the persons entitled thereto."

It will be noticed that the terms referring to property and heirs in these provisions are general. "Any personal estate" and "any property" are sufficiently broad to include choses in action as well as goods and chattels; and "heirs" includes minors as well as adults. No special provision is made for minor heirs. The protection of their interests is left to their guardians, whose duty it is to take care of their estates, real and personal, collect their dues, and protect their rights. R. S., *c.* 150, *ss.* 3, 17. Accordingly, it has been held that a decree upon the settlement of the administrator's account relating to the ancestor's estate binds the minor heir whose guardian has notice of the proceeding and is present (*Simmons* v. *Goodell,* 63 N. H. 458); while such a decree has no effect upon the minor's rights if he has no guardian. *Bean* v. *Bean,* 33 N. H. 279, 284. There can be no doubt that the guardian has authority to request a reservation of personal property for the benefit of his ward and to agree in his behalf upon a division of the property in kind. To hold otherwise would disable the guardian from performing the duties expressly imposed upon him by the statute. Furthermore, it would have a tendency to embarrass and delay the settlement of estates, and would oftentimes place the ward in a disadvantageous position and jeopardize his rights as a *cestui que trust* of the property. The proviso in the statute left the question, whether the residue of the estate should be converted into money or be divided in kind, open for amicable adjustment between the administrator and the heirs, if the latter so desired.

It should be noted in passing, that heirs frequently settle the estates of their ancestors by agreement among themselves, without the intervention of administrators. *Giles* v. *Churchill*, 5 N. H. 337; *Hubbard* v. *Kent*, 15 N. H. 516; *Clarke* v. *Clay*, 31 N. H. 393; *George* v. *Johnson*, 45 N. H. 456. In *Woodman* v. *Rowe*, 59 N. H. 453, one of the heirs was a minor and was represented by a guardian. In *French* v. *Currier*, 47 N. H. 88, there was a division of stocks similar to that in this case.

Thus far the statutes made no provision for making a division and transfer of the property in kind, if either of the parties was unwilling. An act was passed in 1857, by which it was provided that "whenever there shall be bonds, stocks, or other written evidences of debt in the hands of an administrator of a solvent estate, and there are minor heirs, and it shall appear to the judge of probate for the county in which the administrator received his appointment that it would be for the interest of such minor heirs that such property should not be sold by the administrator, but be transferred to the heirs, the judge of probate may order such bonds, stocks, or other written evidences of debt to be transferred to the heirs or the guardians of the heirs respectively, in their fair and just proportion; and the said guardians shall be authorized to receive and hold the same as long as they may deem it safe and prudent so to do," and they shall be held accountable for the property as for real estate. Administrators and guardians were empowered to sell stock, bonds, and securities payable at a distant day, upon license from the judge of probate; and in case of sale were accountable for the proceeds only. The act was not to be construed so as to authorize guardians to invest funds in their hands in a manner not theretofore authorized. Laws 1857, *c.* 1963. This last provision refers to the investment of money already in hand; it would be absurd to suppose that it was intended to prevent the exercise of freedom in the division of property under the prior sections.

· The purpose of the act of 1857 evidently was to empower the judge of probate to order or decree a transfer of bonds, etc., to minor and other heirs whenever it appears to him to be for their interest, even if there be opposition. The act does not purport to take from the ward or his guardian any of the rights and powers which they possessed under the laws previously in force. Its provisions are not inconsistent with those laws. It was an addition to the earlier laws, rather than a modification of them. See *Gardiner* v. *Thorndike*, 183 Mass. 81. Administrators and heirs, including minors, were still, as previously, at liberty to arrange for a division of the residue of the personal property left after the payment of debts, etc., without first having it converted into money.

See *Reed's Estate*, 82 Pa. St. 428. When an order is made, the statute incidentally relieves the guardian from all responsibility for the taking of property in kind instead of in money. The order of the court is an adjudication that it is for the interest of the ward that the property should not be sold, but should be divided in specie. In such case the property goes to the ward like real estate, by inheritance; and the guardian's responsibility begins with its receipt, and in all respects resembles his responsibility relating to the ward's real estate. Unless there is an order, the guardian, upon accounting, must show that in agreeing to the division he acted in good faith and with reasonable prudence and discretion. But this does not make him an insurer that the arrangement shall in fact prove to be for the ward's interest. Although the guardian acts, not as an agent voluntarily appointed and controlled by the ward, but as an officer of the court whom the ward, by reason of tender years, is incapable of controlling, and therefore the guardian should be strictly held to a faithful performance of the duties of the position, yet the law takes cognizance of the fact that he is only a human agency and is liable to err in judgment and in his forecast of the future. Consequently, the law holds him responsible in such transactions, as in all other authorized transactions, only for an observance of fidelity and such diligence, care, and prudence as men of average intelligence observe in managing their own affairs. Woern. Gdnsp., s. 60. Facts often present a different aspect when viewed retrospectively, from that which they present when viewed prospectively; and a guardian who agrees in behalf of his ward to a division of property in kind assumes the risk of being prejudiced by this change of aspect. Therefore, as a general rule, it would be wise for him to obtain an order of the probate court and thereby avoid the responsibility of the transaction; but if, upon a careful consideration of the matter, he is satisfied that a division of the property in kind would be for the interest of his ward, and he acts in good faith and with reasonable prudence, he may agree to it, and the law will uphold his act. If his action is challenged, the question will be whether he acted with good faith and with reasonable care and prudence. The nature of the property, the occasion for its division, and the manner of it, are facts to be considered in deciding the question.

Prior to 1866 there was no statute specifying the nature of the investments which guardians should make. By an act passed in that year, it was provided that they should invest in notes secured by mortgage of real estate at least double in value the notes, or in some incorporated savings bank in this state, or in the bonds of the United States, this state, or some town or county within the state, "and in no other way whatever; *provided, however*, that

it shall be lawful for such guardian to receive bonds, stocks, or other written evidence of debt, wherever invested, from any administrator, and to hold them with the approval of the probate court, in the same way as now provided in chapter 1963 of the Pamphlet Laws of this state." Laws 1866, *c.* 4250, *s.* 1. These provisions have been carried forward to the present time in sections 10 and 11, chapter 185, General Laws, and sections 8 and 9, chapter 178, Public Statutes, somewhat changed in form, but not in substance. See Comm'rs' Rep. G. L., *c.* 179, *ss.* 10, 11; Comm'rs' Rep. P. S., *c.* 177, *ss.* 8, 9. They pertain solely to the investment of funds, and have no application whatever to the transfer of property from the ancestor's estate to a minor, to satisfy his right as an heir or legatee. By the express terms of the statute, it is lawful for the guardian to receive stocks, etc., from the administrator, as previously to the passage of the act.

It appears from these statutory provisions that the defendant, as guardian of the plaintiff, had authority to agree in his behalf with the administrator of Mr. Stevens' estate upon a division of the residue of the personal property of that estate between the widow and the plaintiff. In doing so he was not investing his ward's funds, but was acquiring his ward's inheritance. His authority was not limited or controlled in any way by the provisions of section 11, chapter 185, General Laws. If the interests of his ward required it, he was at liberty to accept notes which were secured otherwise than as prescribed by the statute, and other stocks than those specifically mentioned therein—even notes and stocks that for the time being might be regarded as of little or no value. The South Dakota notes afford an apt illustration of the wisdom of this provision. When they came into the hands of the administrator they were overdue and regarded as of doubtful value. The administrator failed to collect them, although the estate was in the course of administration by him for more than two years. When a portion of them were transferred to the defendant they were regarded as of little value. It is highly improbable that the administrator could have realized more than a nominal sum for them, upon a sale under license from the probate court. The defendant has collected $565, and the plaintiff will realize whatever further can be obtained from them. The other notes (excepting three, amounting to $1,600) and the Gossard stock all represented investments made by Mr. Stevens, a man reputed to be a capable investor and financier. He had great confidence in them. It does not appear that the notes had become due. They were all believed to be good. The defendant was satisfied that they were secured by mortgages of real estate double in value the sums represented by them. The Gossard Investment

Company was engaged in the business of negotiating loans on farm, village, and city properties in the West—a business not specially hazardous if properly conducted. The stock was a good paying security, and was salable in the market at par. There is nothing tending to show that the loans or stock were of a speculative nature. The defendant did not need the money for the plaintiff's support. If these investments had been converted into money by the administrator, and the money had been paid to the defendant, it would have been his duty to reinvest it. The change would necessarily be attended with expense and loss of income, together amounting to a considerable sum. The defendant was advised by able counsel that he was authorized to receive these securities from the administrator as a part of his ward's inheritance. He acted in good faith, believing the course taken to be in all respects a prudent and safe one, and for the interest of his ward. While the fact that Mr. Stevens originally made these investments and had great confidence in them, and the fact that bank officials, trustees, and other investors were in the habit of investing in similar securities, and the advice of counsel that the defendant was authorized to take the securities from the administrator, may not be competent evidence upon the question of the defendant's authority in the premises, they were competent and weighty evidence upon the question of his good faith, care, and prudence. *Kimball* v. *Reding*, 31 N. H. 352, 376. *Nagle* v. *Robins*, 9 Wyo. 211. Although the defendant receipted for the property in gross as if it were money, all parties connected with the transaction understood its real nature, and treated it as a transfer of the property instead of a payment of money. The defendant had no other interest whatever in it than to promote the welfare of his ward. Under these circumstances, the real nature of the transaction cannot be changed, or the rights of the defendant be affected, by mere matter of form. As the defendant was authorized by the law to agree, in behalf of his ward, to a division of the personal estate in kind and to a settlement of the administrator's account accordingly, and as it appears that in making the division he acted in good faith and with reasonable care and prudence, the plaintiff is bound by the division, and the defendant is not liable for losses that are attributable to it. Of course, it was the defendant's duty to exercise reasonable diligence and care in looking after and managing the property after he received it; and it appears that he fully performed this duty.

Among the notes thus accepted by the defendant there were three, together amounting to $1,600, which the administrator had lent money upon during the administration of the estate. See *Judge of Probate* v. *Mathes*, 60 N. H. 433. It does not appear

whether the defendant knew or ought to have known of this fact when the administrator's account was settled. If the law would not justify the acts of the administrator in making these loans, the proper time to raise the question was at the time of the division of the property and the settlement of the administration account. As has been seen, the defendant properly represented the plaintiff in those matters, and the plaintiff is bound thereby. Furthermore, the notes appeared to be such as the guardian might lawfully invest in; and if they are viewed in this light, it will be seen hereinafter that the guardian, in accepting them, acted within the authority conferred upon him by the statute.

The plaintiff seeks further to charge the defendant with the money invested by him as guardian in notes secured by mortgages of real estate in the West, on the ground that the real estate was not double the notes in value. The defendant in every instance, excepting certain notes hereinafter considered by themselves, examined the application for the loan, considered the evidence relating to the value of the real estate mortgaged to secure it, and " honestly believed " that the value was double the note. The affiants as to values appeared to be acquainted with such property, and their certificates were accepted by the defendant without further inquiries concerning them, and given full faith and credit. The method thus adopted was the only practicable method available, and was that adopted by bank officials, trustees, and other investors in such securities. In arriving at his belief, the defendant acted as a prudent, careful, and reasonable man, considering the nature and importance of the business. The real estate mortgaged to secure the notes that were overdue and unpaid January 21, 1901,—the date to which the defendant's final account related,—was not double the notes in value, but he was not in fault for not knowing the fact. How much they fell short does not appear. The question is whether, in view of these findings of fact by the superior court, the investments were authorized by the successors of the statute of 1866, already mentioned. The present form of this statute, omitting the parts relating to the exception before mentioned, is as follows: " Every guardian of a minor shall invest in the name of his ward, or in his own name as guardian, the money and the proceeds of all real and personal property of his ward  .  .  .  in notes secured by mortgage of real estate at least double in value of the notes, in some incorporated savings bank in this state, or in the bonds or loans of this state, of some town, city, or county of this state, or of the United States, and in no other way." P. S., c. 178, s. 9. The plaintiff takes the position that an investment in a note secured by a mortgage of real estate is unauthorized by the statute, unless it

appears, when the question arises in a judicial proceeding, that the real estate was of the required value, however careful, intelligent, and honest the guardian may be in determining that it was so when he made the loan. The position, in short, is that unless the guardian is infallible, he is liable to have his act in making such an investment pronounced unauthorized, and this upon a finding of facts by men equally fallible with himself. Was such the intention expressed by the legislature in the statute?

The statute makes no provision for judicially determining in the first instance the value of the real estate offered for mortgage. Such value is not ordinarily a fact, certain and readily ascertainable. It depends upon a great variety of circumstances. Persons well qualified to judge oftentimes differ widely regarding it. Generally, a person who proposes to loan money upon a note secured by a mortgage of real estate must determine for himself the value of the property offered for mortgage. It is reasonable to suppose that the legislature had these facts in mind. It is to be presumed that they contemplated a plan that would be practical. In view of these considerations, it is manifest that the intention was that the guardian—the same as lenders of money generally—should satisfy himself as to the value before making the loan. The statute requires him to be convinced that the value is double the note. In forming this judgment, he must act as in all other matters entrusted to his discretion—in good faith and with reasonable care, diligence, and prudence, such as men of average prudence exercise under like circumstances. If upon an investigation of that kind he becomes satisfied that the real estate is of the required value, the statute authorizes him to make the loan, and will protect him accordingly. But if he voluntarily makes a loan, knowing that the real estate mortgaged to secure it is of less value than double the note, or if, by reason of his want of good faith or of due care, diligence, and prudence, the real estate does not meet the statutory requirement, the loan will be outside the authority of the law, and he will be responsible to his ward for the money loaned.

When *Kimball* v. *Reding*, 31 N. H. 352, was decided, the rule as to investments by trustees was very general in character, requiring merely that they should invest in "good and safe securities," without specifying the securities so regarded further than that loans of money upon notes must generally be secured by mortgage, or sureties, or in some other way. See *Knowlton* v. *Bradley*, 17 N. H. 458; *Judge of Probate* v. *Mathes*, 60 N. H. 433. In *Kimball* v. *Reding*, *Wood*, C. J., after referring to this fact, says: "If he [trustee] lends the money, he ought to be prepared to show that the borrower was, at the time, possessed of

property and in good credit, and that he has taken security in the names of persons of like standing, or, what is less open to question, in property of value, according to the usual tests of value. We mean that the trustee should show that he has endeavored to keep within these rules, so that the loss, if any, has been in spite of these endeavors and by reason of causes which have baffled them, whether by misleading his honest judgment as to the actual character of the property or of the individuals at the time, or by effecting an actual change and prostration of them since." These observations apply with the same force to the situation as changed by the statute, so far as real estate mortgages are concerned. *Bell* v. *Sawyer*, 59 N. H. 393. Upon considering the findings of the superior court, it cannot be held that the guardian's investments in the mortgage loans under consideration were not authorized by the statute.

The guardian took certain notes secured by mortgages of real estate less in value than double the notes, in settlement of claims that he had against his agent for the agent's defaults. He knew that the real estate mortgaged was not of the required value. He made every reasonable effort to collect the claims, but failing to do so, finally accepted the notes as the only satisfaction of the claims he could obtain. The loans were in a sense involuntary. The origin of the claims, or his failure to collect them, was not due to any want of faithfulness, diligence, care, or prudence on his part. It would be a novel and unreasonable rule of law that would not allow a guardian to save for his ward all that could be saved under such circumstances. On the contrary, the law imposed the duty upon the guardian to use reasonable care and diligence to that end; and it appears that he fulfilled the duty in this instance. The transactions were not investments of money under the statute, but the settlement of desperate claims outstanding in favor of the ward. His authority in the premises was derived from section 6, chapter 178, Public Statutes—not from section 9 of that chapter. The findings of the superior court fully justify his acts with reference to these claims. *Dodge* v. *Stickney*, 62 N. H. 330.

The order of the superior court affirming the decree of the judge of probate should stand.

*Case discharged.*

Young, J., did not sit: the others concurred.